# CHARLESTON

TETER v. TETER.

Submitted February 27, 1906.   Decided April 17, 1906.

| 59 | 449 |
| f63 | 169 |
| 63 | 177 |
| 63 | 289 |

1.  CANCELLATION OF INSTRUMENTS—*Undue Influence—Mental Inca-
    pacity—Burden of Proof.*

    In a suit, brought by a son after the death of his father, to set.
    aside, for mental incompetency and undue influence, deeds made
    by the father, while aged, infirm and feeble in mind, by which he
    had granted the whole of his real estate to his wife and a daughter
    who resided with him, to the exclusion of his other children, all of
    whom were of mature age, married and residing elsewhere, the
    burden of proving both undue influence and mental incompetency
    is upon the plaintiff.  (p. 450.)

2.  DEEDS—*Mental Capacity of Grantor—Infirmity of Mind.*

    Mere infirmity of mind and body is not sufficient to overcome
    the legal presumption of mental capacity in a grantor.   In order
    to have such effect, the evidence must show that he did not have
    sufficient understanding to clearly comprehend the nature of the
    business he was transacting.  (p. 456.)

3.  EVIDENCE—*Competency of Grantor—Opinion Evidence.*

    On the question of the competency of a grantor to execute a
    deed, the value of the opinions of non-expert witnesses, who have
    had opportunity to form intelligent opinions, respecting his com-
    petency, depends upon the reasons therefor afforded by the facts
    upon which they are predicated, as stated by the witnesses.
    Where the opportunities of such witness' to obtain knowledge of
    the grantor's mental condition have been but slight, and the facts
    given are meager, such evidence is entitled to but little weight.
    (p. 456.)

4.  DEEDS—*Validity—Undue Influence.*

    Old age, physical infirmity and disease and feebleness of intellect,
    on the part of a grantor, together with the fact that he granted
    the whole of his estate to his wife and one daughter, who resided
    with him, and upon whom he was dependent for personal care and
    attention, to the exclusion of all his other children, raise no legal
    presumption of undue influence.   They are only circumstances
    slightly tending to establish it.  (p. 456.)

5.  SAME—*Evidence.*

    That, in such case, the disposition made of the grantor's prop-
    erty is wholly different from what had previously been intended,
    as shown by a will executed by him at an earlier date, is a cir-
    cumstance from which undue influence may, under certain condi-
    tions, be inferred; but, if it further appear that, at the time of the

execution of the deed, proceedings were pending for the en-
forcement of liens upon the grantor's real estate, for the discharge
of which no funds were at hand or within reach; and that such
indebtedness weighed heavily upon his mind at the time of the
execution of both the will and the deed, this circumstance, together
with other facts set out in detail in the opinion in the case,
affords grounds for a strong inference to the contrary. (p. 461.)

Appeal from Circuit Court, Barbour County.

Bill by W. W. Teter, trustee, against Elizabeth Teter
and others. Decree for defendants, and complainant ap-
peals.

$\qquad$ *Affirmed.*

E. D. TALBOTT and J. BLACKBURN WARE, for appellant.
FRED O. BLUE, for appellees.

POFFENBARGER, JUDGE:

From a decree of the circuit court of Barbour county, pro-
nounced May 25, 1904, dismissing a bill in equity in a suit insti-
tuted for the cancellation of two deeds, the plaintiff in said bill,
W. W. Teter, trustee, has appealed. The deeds in question bore
date, respectively, May 1, 1901, and May 13, 1901, the first
one of which, executed by Jesse Teter, purported to convey
all of his real estate to his wife, Elizabeth Teter, and his
daughter, Mertie E. Teter, in consideration of constant ser-
vices rendered to him and other good and valuable consid-
erations, not named; and the other of which, executed by
Jesse Teter, Elizabeth Teter and Mertie Teter, con-
veyed to the Valley Coal & Coke Company, a corpor-
ation, the coal under three tracts of said land, contain-
ing, respectively, 165½ acres, 26 77-100 acres and 4 93-100
acres.

The grounds for cancellation set up in the bill are mental
weakness and incompetency on the part of the grantor,
and undue influence exerted upon him, in obtaining the ex-
ecution of the deeds, by his wife and daughter Mertie, a
married daughter, Mrs. Ida M. Huff, and her husband, Dr.
M. M. Huff. The issue thus presented very naturally
brought into the record, in addition to the opinions of wit-
nesses, respecting the mental competency of the grantor,
his situation and circumstances. Besides the two daughters,
he had three other living children, the plaintiff, W. W.

Teter, Floyd Teter and Thomas Benton Teter, all of whom
had reached mature manhood and had left his home. Of
his family there remained with him only the wife and the
daughter, Mertie E. Teter. Mrs. Huff and her husband
lived some eighteen miles away at the town of Philippi.
His home farm consisted of a tract of 250 acres of land, in
addition to which he owned three tracts above mentioned, sit-
uated on Zebb's Creek in Barbour county, and an interest in
a 300 acre tract of timber land known as the Lime Hill
farm and some other real property. It seems that the
larger part of the Zebb's Creek land, particularly the 168
acres, described, in the deed conveying the coal, as contain-
ing 165 1-2 acres, and a 19 acre tract adjoining it, had at one
time belonged to said W. W. Teter, from whom it was sold
in 1895, in a creditor's suit, brought by the father, Jesse
Teter, and purchased by him at the sale, the son W. W.
Teter having been unfortunate in business and lost all his
property. Some advancements seem to have been made to
Thomas Benton Teter, but nothing to Floyd Teter or Mrs.
Huff, so far as the record shows. Jesse Teter, however,
by reason of endorsements, from time to time, became
liable for debts of Dr. M. M. Huff, in considerable amounts,
for which judgments had been taken which constituted liens
upon the land. In the year 1896, Teter was stricken with
paralysis which seems to have disabled him for some time
and from which he never fully recovered. His purchase of
the W. W. Teter land seems to have ante-dated this mis-
fortune by about a year. Sometime afterwards, August
22, 1896, he executed a will by which he gave the home
place and some other property to Mrs. Huff, Mertie E.
Teter and Floyd Teter. He also gave to Mertie Teter a 26
acre tract of the Zebb's Creek land, and to Thomas Benton
Teter five acres of land on Zebb's Creek, in trust for the
benefit of his children, explaining that the gift was in ad-
dition to advancements he had previously made to said son.
The other Zebb's Creek land he devised to his son, W. W.
Teter, "as trustee * * * to be used in the maintenance, edu-
cation and support of the children and heirs of his body, by
his beloved wife Mattie V. Teter," and authorized and di-
rected his said son, as such trustee, "to use said lands in
whatsoever manner or form he may deem most fit in the main-

tenance, education and support of his said children," and further authorized him to make sale of the lands and convert them into money or bonds, and use the proceeds for the purposes aforesaid.    Sometime in the year 1897, he was afflicted with another stroke of paralysis which, for a time, it was thought, would be fatal, but he rallied from that to some extent.    On the first day of May, 1901, he executed the deed first above mentioned, whereby he conveyed all his real estate to his wife and the daughter Mertie.    Immediately afterwards, the coal in the Zebb's Creek land was conveyed as aforesaid.    He died in September, 1901, aged 78 years.    At the time of the execution of these deeds, there was a suit in equity pending against · him for the subjection of his real estate to the payment of judgment liens, but for what amount, the record does not accurately disclose.    During the period of his sickness, he was attended by the son-in-law, Dr. M. M. Huff, who resided as above stated, at Philippi. a place distant from Teter's residence about eighteen miles, although there were other physicians residing in the neighborhood, whose services could have been procured.    Dr. Huff, his wife, Mertie Teter and Elizabeth Teter, were the only persons who were with him, to any considerable extent, at his home, from the time at which he received his first stroke of paralysis until he died.    The three sons and some of the grand children were there occasionally, as were other persons.    The deed of May 1, 1901, instead of being admitted to record, was put into the custody of Dr. Huff, who retained it until after the grantor's death.    It was admitted to record January 13, 1902.

The evidence relating to the physical and mental condition of Jesse Teter, from 1896 until the time of the execution of these deeds, seems to fairly establish the following facts: After the first stroke of paralysis, his physical health was very much impaired, and he had difficulty in speaking because the use of his tongue was affected.    From that time, he never had his former mental vigor and capacity; his mind seemed to wander so that he was, at times, unable to pursue a given subject in conversation, and occasionally he did things which indicated insanity.    The condition of his mind seems not to have been uniform; for the statements

of the witnesses who saw him at different times vary somewhat, not only in expressions of opinion as to his mental condition, but in descriptions of his conduct also.    After the second stroke, which occurred in 1897, his condition, both physical and mental, was probably worse than it was between that date and the date of his first stroke; but, after that he still went from home occasionally unattended, and transacted some unimportant business.    Witnesses testify to having gone to his home to see him on business, relating to his lands, and to his having been away from home on business.

As to the preparation and execution of the deed of May, 1, 1901, the evidence fairly establishes these facts:    Jesse Teter did not participate extensively in the preparation of it.    What directions he may have given, or whether he gave any, is not disclosed, except by the evidence of Dr. Huff.    It was prepared at his home by Warren B. Kittle, at the request of Dr. Huff.    It seems not to have been written in the presence of Teter, but in a room other than the one in which he was, but it was read to him.    The only persons present at the time were Teter, his wife, his daughter, Mertie, Dr. Huff, Mrs. Huff and Kittle.    From the evidence of Kittle, it is clear that the mother, daughters and son-in-law participated actively in the preparation of it.    The directions must have been given by them, for he says about the only thing he remembers having heard Jesse Teter say was, that he wanted to get his debts paid before he died if he could.    In view of the preparation of the deed, W. W. Teter was mentioned, and the mother said she would see that he got some of the property, but this discussion was not in the presence of Jesse Teter.    The merits of Miss Mertie Teter, and what was due her, were discussed in the same connection, and it was assigned as a reason for the conveyance to her, that she had staid at home, worked hard and taken care of Mr. Teter and his property during his illness.    Kittle, the scrivener, was cautioned not to reveal the transaction to other members of the family. The deed was not signed in his presence, but, according to the testimony of Dr. Huff, on the same day.    The acknowledgment was taken, three days later, by A. F. Rohrbough, at the request of Dr. Huff.    When he first

saw the deed, it bore the signature of Jesse Teter. He made no explanation of the deed to Teter, but the latter acknowledged it.

The circumstances of the preparation of the deed of May 13th are not shown. It does not appear who wrote it. But Gordon B. Teter, a second cousin of Jesse Teter, took the acknowledgment. There seems to have been two deeds prepared for the conveyance of the coal, the first of which was defective in some respect. Gordon Teter went there on two different occasions for the purpose of taking the acknowledgments, the last time on the 18th of June, 1901, and the first time about two weeks earlier. He says that from what he saw of Jesse Teter at the time he took the acknowledgments, he does not think he was able to understand what he was doing. On the second occasion, Dr. Huff handed him the deed, telling him it was all signed up and nothing remained for him to do but to write the certificate of acknowledgment; and after having taken the acknowledgments of Mertie and Elizabeth Teter, he started to the room of Jesse Teter to take his, but was stopped by Dr. Huff who told him to sit down a minute until he went in to see whether he was up yet. Dr. Huff remained in the room so long the notary became restless, and had Miss Teter tell him he was becoming impatient. When he went into Jesse Teter's room, he found him lying in bed and, after explaining the deed to him, asked him if he acknowledged it, but he looked as if he did not understand the notary, and he again explained it, and then Teter nodded his head, and, being asked if he acknowledged his signature to the deed, he said "Yes, that is alright." This witness says that about the first of May, 1901, Jesse Teter was confined to his bed all the time and was under the care of Dr. Huff.

Chief among the specific instances of alleged insane conduct is one related by W. S. Steerman which he fixes about the year 1898. He says Teter came to his place riding a horse, without either bridle or saddle, and, unable to dismount in the usual way, rolled off on a platform, where he lay during the whole afternoon seemingly unconscious. He went to him and tried to talk to him but was unrecognized. Another is given by Thomas Benton Teter, who says, on

one occasion, his father, came to his mill on horseback and rode through the river, when it was so high as to make it dangerous; and that the act was so rash he knows his father would not have done it, if his mind had been in its normal condition. He does not give the date of this incident, but says "My father's mind was affected to such an extent as to incapacitate him for business as early in 1889." He further says that when he went to see his father about the first of May, 1901, his condition was so bad that when he would go into the room and tell him who he was, he would call for the servant girl, Belle.

The evidence for the defendant consists of the depositions of Dr. M. M. Huff, Robert Rinehart, Henry England, and Creed Day; all of whom expressed the opinion that Jesse Teter was mentally competent to transact business and to execute deeds. Rinehart says he went to see him on business, namely, the pasturing of some land on Zebb's Creek, three times in April, May and June, 1901, and could notice no difference in his mental condition through these months. England's testimony relates to conversations had with him in 1899 which, he says, were intelligent, but that the condition of Teter's tongue interfered seriously with his talking. Day says he sheered his sheep for him in the years 1897 to 1901, inclusive, and saw him last in May, 1901. He thinks he was capable of transacting business. Dr. Huff's testimony relates principally to the execution of the deed and the reasons assigned by Jesse Teter for disposing of his real estate in the manner in which he did by the deed of May 1, 1901. He denies all fraud in connection therewith and the exertion of influence in said transactions, and says what he did in that connection was done at the request of Jesse Teter. He says Jesse Teter conveyed the land to his wife and daughter, Mertie, under the belief that it was his duty to do so, in view of their services to him and the faithful care and attention which they had bestowed upon him.

In addition to the evidence of intention to make provision for the children of W. W. Teter, afforded by the will made in 1896, the testimony of witnesses clearly indicates the existence of a strong desire on the part of Jesse Teter to bestow upon them the Zebb's Creek land hereinbefore

mentioned.   One witness says he talked to him about the land, soon after the first stroke of paralysis, and regretted that he had not previously conveyed it to W. W. Teter for them, because it was then free from liens, but had since become encumbered so that he could not make the disposition of it, he had intended and desired to make.    Other witnesses testify to this desire on his part, as well as to his expressions of appreciation of the kindness shown him by W. W. Teter.   He contrasted his conduct with that of his other sons, saying he had done much more for him and that he felt that he ought to do something for his children.

The first inquiry is whether the legal presumption of sanity and mental competency of the grantor has been overcome by the evidence adduced for that purpose.   That old age and sickness are not of themselves sufficient has been repeatedly decided by this Court.   *Buckey* v. *Buckey*, 38 W. Va. 168; *Delaplain* v. *Grubb*, 44 W. Va. 612; *Eakin* v. *Hawkins*, 52 W. Va. 124.   Nor is mental distress sufficient.   *Farnsworth* v. *Noffsinger*, 46 W. Va. 410.   The witnesses seem to have been unanimous in the opinion that the once strong mental vigor of the grantor had been impaired and broken by his affliction.   All seem to admit that from the date of the first attack his mind was never as strong, as it had formerly been, and that his powers of mental concentration and adherence had been weakened to an extent that was noticeable. How far this impression was due to the impediment of speech from which he suffered, as a result of his physical ailment, it would be difficult to tell, but it would be fair and reasonable to say that his peculiarity of expression, no doubt, in some instances, was attributed to mental weakness.    Conceding that the evidence established feebleness and weakness of the intellect, these qualities are insufficient to prove incompetency to execute a deed.   See the cases above cited.   A just criticism upon the evidence offered to show incompetency is that it consists almost wholly of opinions of nonexpert witnesses.    That this is an unsatisfactory kind of evidence has been repeatedly declared by this Court, as well as by other courts.   In *Jarrett* v. *Jarrett*, 11 W. Va. 584, it is said: "The mere *opinions* of witnesses not experts are entitled to little or no regard: unless they are supported by good reasons founded on facts which warrant them: and if the reasons

and facts upon which they are founded are frivolous, the *opinions* of such witnesses are worth but little or nothing." The expressions of opinion in this case are based upon mere observation of the physical condition of the grantor, made upon occasions of casual visits to him, and slight conversations. In a few instances, witnesses have said he did not seem to recognize them or know anything. These may have been occasions on which he was suffering more than was usual, or when his mind was in its worst condition. That he was not always in such a condition of imbecility is evident from the fact that some of the witnesses who testify to his mental incompetency say they visited him on these occasions in reference to business matters and discussed them with him. It is true they say he was not capable of transacting business, but these conclusions were based, to some extent, no doubt, upon their peculiar views and conceptions as to what amounts to sufficient capacity for that purpose. Mental weakness and feebleness do not constitute incapacity in a legal sense. A vast amount of business is transacted by people who do it unskillfully and unsuccessfully, but they are not considered, for that reason, lacking in mental capacity, so as to render their acts void or voidable.

Several witnesses say the mental condition of Teter was very bad in the months of April and May, 1901. As the time given is very near the date of the two deeds, such a condition of mind is matter for serious consideration in reviewing this decree. A grandson says he and his father were there to see him, in the latter part of April or first part of May, for two hours or longer, and that he recognized neither of them. If the testimony of this class were uniform and without variation, it would be impossible to say there was sufficient capacity to execute a deed. But it is not. Lloyd Wilson saw him about the same time, according to his testimony, and, though he says Teter was not, in his opinion, competent at that time, he appears not to have been, by any means, oblivious to his surroundings, for he says he conversed with him, and, in specifying the evidence of mental weakness which he noticed, he says his mind would wander and he seemed to be unable to confine himself to one subject of conversation. John Booth, another strong witness for

the plaintiff, while expressing the opinion of mental incapacity, in April, 1901, admits that he conversed with Teter, and that, though confined to his bed most of the time, he was able to be up part of the time.    With him, as with other witnesses, the noticeable defect was inability to pursue a subject of conversation.    He says Teter would fail to recognize him at times, but, as to this, he is very general and indefinite and stops short of showing, by a recital of facts and conduct, such incapacity.    It amounts to no more than belief that he was occasionally unrecognized.    W. A. Streets visited him after the execution of the deed of May 1, 1901, for a few minutes.    He says he did not stop twenty minutes in all. Mrs. Huff took him to the bedside of her father and told him who he was.    He opened his eyes, but showed no sign of recognition and no desire to converse.    The conclusion he gives is based upon a very short and hasty observation.    The physical weakness of Teter, together with difficulty in speech may have accounted for his silence, and his silence may have constituted largely the ground of belief on the part of Streets, that the sufferer did not recognize him.    But he did respond to the question of his daughter and look up at Streets.    Against this kind of testimony we have that of Kittle, who wrote the deed and read it to Teter and who expresses the opinion that he was capable of understanding it. Rohrbough, who took the acknowledgment of that deed, said he asked him if he acknowledged it, and that he responded in the affirmative.    His observation was but slight and both sides refrained from taking his opinion as to the mental condition of Teter at that time; but the fact of Teter's response to the inquiry contradicts the theory of absolute unconsciousness, advanced by some of the other witnesses.    Gordon B. Teter took his acknowledgment twice in the month of June, 1901, and, while he expresses the opinion that Teter was not capable of executing a deed or transacting business, he shows not only that he was conscious, but that he was able to grasp the matter in hand.    He says he did seem, at first, not to understand, but that, upon repeating to him his statement, as to what the paper was and asking him if he acknowledged it, he responded "Yes, that is alright."    This evidence opposes the theory of total loss of mental power.    The evidence adduced by the plaintiff is,

as a whole, unsatisfactory in this, that, while it consists of
opinions and belief on the part of the witnesses, it fails to set
out or disclose what Jesse Teter did during the four or five
years of his affliction. Who attended to his business during
that period is not shown. What he did is a far better index
to the condition of his mind than what people thought of
him. *Ward* v. *Rrown*, 53 W. Va. 227, 263; *Beverly* v.
*Walden*, 20 Grat. 147; *Mercer* v. *Kelso*, 4 Grat. 106; *Temple*
v. *Temple*, 1 H. & M. 476. . He had considerable property,
maintained a household which, no doubt, as in other cases,
required considerable attention. There seems to be a tacit
admission throughout all the testimony that, during the
greater part of this time, Jesse Teter attended to his busi-
ness as best he could. Steerman says he came down and
looked after his Zebb's Creek land numerous times within
that period. Other witnesses testify to his having been in Be-
lington and elsewhere. One witness says that in the month of
November, 1900, he attended religious services at a church
some distance from his home, dined after the services with
a neighbor, and then rode back home and dismounted from
his horse, without assistance. John Booth strongly inti-
mates in his testimony that for a long time he went about
his business. He says "I know from the time he was first
paralyzed he was out going about different places, at least
I have seen him away, but for a while, I could not
tell just how long, he was confined to his room mostly.
He could cane around some in the house." W. A. Streets
says he saw him going along the public road alone in the
year 1900.

Our conclusion, from the whole evidence, is, that it estab-
lishes nothing more than feebleness and weakness of mind,
and fails to make out a case of absolute mental incapacity.
According full credibility to all the witnesses, it appears that
there were, notwithstanding the weakened condition of mind,
lucid intervals during which there was sufficient capacity to
appreciate and understand the subject matter of a business
transaction, and that the two deeds in question were executed
at such times.

This, however, does not dispose of the case. It remains to
consider the evidence of undue influence. Upon this inquiry,
the extent of mental weakness must be kept in view as a ma-

terial circumstance.   Naturally, it would   require   more evi-
dence to overthrow a deed executed by one whose mental
faculties were only slightly impaired, than that of a person
laboring under serious impairment of mind.   Under the pe-
culiar circumstances of this case, however, this distinction is
probably not very important; for the evidence of undue in-
fluence is not direct and positive.   It consists almost wholly
of presumptions arising from relationship and conduct, bear-
ing remotely upon the transactions which this bill seeks to
overthrow.   That there was persuasion on the part of the
beneficiaries of the deed, is a matter of inference only.   No
witness testifies to any specific act of that kind.   The circum-
stances principally relied upon are, that the grantees in the
first deed resided with the grantor, at his home, and were in
constant touch and communication with him; that the deeds
were prepared by the scriveners at the request of Dr. Huff
and the grantees; that the disposition made of the property
is different from that which the grantor previously intended to
make; and that the whole estate is bestowed upon two mem-
bers of the family, to the exclusion of all the others.   To
these circumstances, are added the facts that Dr. Huff's pres-
ence was considered necessary on the occasions of the prep-
aration and acknowledgment of the deeds;—that no witness
testifies to the time and manner of the signing of the deed,
except Dr. Huff; that the deed was concealed until after
the death of the grantor; and that Huff was the principal
debtor in some of the judgments which constituted liens on
the land.

The relationship of the parties, the grant of the whole
estate to certain members of the family in exclusion of
others, and the circumstances of solicitation on the part of
the grantees, if there was any, do not, either singly or col-
lectively, raise any legal presumption of undue influence.
*Delaplain* v. *Grubb*, 44 W. Va. 612; 29 Am. & Eng. Ency.
Law, pp. 132-133.   At most, they are mere circumstances to
to be weighed with other evidence in determining the issue.
"Moderate solicitation to procure a deed, even when ac-
companied with tears, does not constitute undue influence."
*Doran* v. *McConlogue*, 150 Pa. St. 98.   In that case, the
grantor was afflicted with paralysis, resulting in an impedi-
ment of speech, as in this case.   A medical witness testified

that the physical condition of the grantor was one of great feebleness and that, at times, he was not able to talk intelligently. There, as in this case, there was a combination of physical and mental feebleness, difficulty of speech, occasional mental wandering, and positive proof of unequivocal and indisputable solicitation on the part of the grantee; and yet the court upheld the deed, saying the evidence wholly failed to show sufficient ground for overthrowing it. "Though the mere fact that the parent is old and feeble and dependent upon the child is insufficient to cause a court to presume that transactions favorable to the child resulted from undue influence, it is clear that it may be important in connection with other circumstances on the question of undue influence, as where the parent is illiterate, or conveys everything to one child to the exclusion of other children." 29 Am. & Eng. Ency. Law. 133. But the two facts of dependence and exclusion combined raise no legal presumption. They constitute mere evidence. In the case of *Boggess* v. *Boggess*, 127 Mo. 305, a deed was set aside on the ground of mental incompetency, and the evidence tended to establish a condition of things worse than is disclosed by the evidence in this case. There was some conflict in the testimony, perhaps as great as there is here. But the appellate court, in reviewing the action of the trial court, did not regard it as a clear case of either want of capacity or undue influence. In concluding their opinion, the Court said: "Under these circumstances this court must and should defer largely to the trial court. Cases of this character, cases in which the weight to be accorded to the different witnesses must largely determine the issue, evoked from this Court the rule that it would defer in such matters to the trial court. It is peculiarly appropriate that we should do so, unless the record presents some very convincing reason for varying from this usual course."

Nor does the difference between the disposition of the property made by the deed, and that which the grantor had previously intended to make, as shown by the will executed in 1897, combined with the evidence of previous declarations of intention, raise a presumption in law of undue influence. Page on Wills, section 422. The revocation and alteration of wills by testators is of frequent and common occurrence. That a

disposition previously intended is wholly changed and altered amounts to a circumstance, a fact, having direct and important bearing on the question of undue influence, when there is other evidence having a like tendency, is plain; but, if there is a reason for it, or if there are facts and circumstances which the court can see may have been deemed, by the grantor or testator, a sufficient ground for the change, the force and effect of the circumstances is, in reason, seriously broken and impaired, if not wholly overthrown. It appears from the testimony of a witness, that before the will was made, Jesse Teter expressed doubt and fear as to whether it was in his power to do anything for the children of his unfortunate son, because the property had become encumbered by liens. He regretted that he had not conveyed it to them before this occurred. He was conscious of his financial, as well as his physical, condition at the time these deeds were made. At the time of the execution of the deed he expressed to Kittle a desire to provide for the payment of his debts, and that seemed to be the one subject to which his mind went more strongly and directly than any other. It may be that his property was amply sufficient to pay all of his debts and still leave something for all of his children, and that there was no necessity for putting his property into the hands of those members of the family whom he deemed competent to handle it and satisfy the debts and save something out of the estate; but this argues lack of judgment, discretion and business capacity in the ordinary sense of the terms, rather than lack of competency to execute a deed, or that his act resulted from undue influence. Some four years elapsed between the date of the will and the making of the deed, during all of which Jesse Teter was oppressed by the knowledge of his indebtedness and his inability to relieve himself. A suit was pending then for the enforcement of judgment liens against his property. He knew the lack of business capacity on the part of his son, W. W. Teter. That had been demonstrated. For some satisfactory reason he never had intended to leave anything to Thomas Benton Teter. The five acres of land mentioned in the will was devised to him as trustee for the benefit of his children. There is nothing in the evidence which shows that he had any special inclination to favor the other son, Floyd Teter.

As he was not, so far as the evidence shows, in these years of disease and distress, called in as a business adviser, it may be assumed that there was a lack of confidence in his business capacty. In view of this condition of things, and of the hope which Jesse Teter may have entertained of recovery, to a great extent, of his former mental and physical vigor, at the time he made the will in 1897, it is not unreasonable to attribute the alteration of his intention to them, rather than to the exercise of any influence upon him by the grantees. An indebtedness, for the payment of which there is no money at hand, and for the collection of which legal proceedings are pending, is a circumstance which weighs heavily upon persons who are in the full possession of the vigor of manhood, both physical and mental, and often impels them to do things which, to others, may seem unnecessary, wasteful and improvident. Why should it not powerfully operate upon the mind of one who is completely broken in health, utterly hopeless of recovery and fully cognizant of the near approach of death? Its potency, as well as the recognition thereof by courts, is illustrated in *Argo* v. *Coffin*, 142 Ill. 368. If it were a case in which reason and proper motive for the change were wanting, such an alteration as is shown here, would be entitled to great weight.

That the scriveners and officers came at the request of Dr. Huff and Miss Mertie Teter is a circumstance entitled to but slight weight. It is not inconsistent with entire propriety on their part. Dr. Huff says everything was done at the request of Jesse Teter and his statement may be absolutely true. There is no evidence of any protest or hesitancy on the part of the grantor. Not a witness testifies that he was urged or importuned to acknowledge either of the deeds. On the contrary, so far as there is any direct testimony, everything was perfectly voluntary and free. Nor is the fact that Dr. Huff was present, on all these occasions, anything more than a mere circumstance. It is not inconsistent with proper motives and proper conduct. Nor is the fact that the deed was withheld from record and that Mr. Kittle was requested not to mention it to the other members of the family. The person who made this request may have had full and perfect belief in the competency of the grantor and no desire or pur-

pose in the concealment of the deed other than that of avoiding annoyance to the grantor, in his enfeebled condition, as. well as unseemly wrangling and controversy, among the members of his family, at his death bed. We do not think the circumstance of liens on the property for debts of Dr. Huff, which were discharged out of the proceeds of the coal, taken with all the others, sufficient to overthow the deed. All this evidence is indirect and remote in its bearing upon the issue raised.

As to mental weakness, the evidence is lighter in weight than in the case of *Buckey* v. *Buckey*, and less satisfactory, in that it is lacking in specification of the facts on which the witnesses base their opinions; and, as to undue influence, it is entirely presumptive. It is a case of presumption of fact against presumption of fact, while the witnesses who were present at the execution and acknowledgment of the deeds, detail facts and circumstances, indicating the presence of sufficient mental capacity and absence of any hesitancy or reluctance on the part of the grantor, and of coercion on the part of those by whom he was surrounded.

Unable to see that the circuit court erred in its finding, we affirm the decree, with costs to the appellees.

*Affirmed.*