[Civ. No. 3167. Third Appellate District.—December 10, 1926.]

## S. LONGMIRE, as Administrator, etc., Respondent, v. HARTLEY KRUGER, Appellant.

[1] DEEDS — CONVEYANCE FROM PARENT TO CHILD — VALIDITY — PRESUMPTION — BURDEN OF PROOF — EQUITY—UNDUE INFLUENCE.—A deed of conveyance from a parent to a child, without further facts, is presumed to be valid; but where the parent is aged, infirm, or otherwise in a condition of dependency upon the child, who exercises authority over him, a presumption arises which places the burden upon the beneficiary of the gift conveyance to show the transaction was fair and free from fraud; and equity will scrutinize such a transaction with great care, and under such circumstances slight evidence will suffice upon which to base a finding of undue influence and set aside the deed.

[2] ID.—UNDUE INFLUENCE—EVIDENCE—RELATIONSHIP OF PARTIES— —LACK OF MENTAL VIGOR.—Any influence brought to bear upon a person entering into an agreement, or consenting to a disposal of property, which having regard to the age and capacity of the party, the nature of the transaction, and all the circumstances of the case, appears to have been such as to preclude the exercise of free and deliberate judgment, is considered by courts of equity to be undue influence, and is a ground for setting aside the act procured by its employment; and the fact that the parties stand in such a position toward one another, either by reason of relationship, professional employment, or otherwise, that

1. See 9 Cal. Jur. 234.
2. See 9 Cal. Jur. 226.

the grantor is peculiarly susceptible to the exertion of influence by the grantee, is a consideration of primary importance in this connection in cases where the transaction is in itself improvident or disadvantageous to the grantor; and the fact that the grantor is lacking in such mental vigor as to enable him to protect himself against imposition is a reason for the interposition of equity to protect him, although the mental weakness is not such as to justify him in being regarded as totally incapacitated.

[3] ID.—PROOF OF UNDUE INFLUENCE.—The question of what constitutes sufficient proof of undue influence depends upon the facts and circumstances of each particular case.

[4] ID. — WILLS — UNDUE INFLUENCE — PRESUMPTIONS — BURDEN OF PROOF.—No presumptions of undue influence are indulged in upon the contest of a will, unless confidential relations are first established; but with respect to gifts or conveyances *inter vivos,* the extreme age and infirmity of the grantor, together with slight evidence of circumstances from which it may be inferred that the instrument was the product of coercion, will suffice to shift the burden and require the beneficiary ·to show affirmatively that the transaction was fair and free from influence.

[5] ID. — DELAY IN RECORDING CONVEYANCE — SUSPICIOUS CIRCUMSTANCE—GUILTY CONSCIENCE.—In this action to set aside a deed of conveyance from an aged and infirm grantor to her grandson, the fact that the latter did not record his deed for a considerable period of time, and that he then recorded it only when plaintiff had discovered its existence and was searching for it in the records of the county, was a suspicious circumstance which tended to indicate guilty conscience of unfair means resorted to in procuring the instrument.

[6] ID. — CHANGED DISPOSITION OF PROPERTY — UNDUE INFLUENCE — EVIDENCE.—In such action, the fact that the grantor had shortly theretofore made a will leaving her home (which was the bulk of her property) in equal shares to her son and two grandsons, whereas the deed in question gave defendant (one of the grandsons, who had made his home with the grantor) the property absolutely, without any added knowledge on the part of the grantor, or any change in the relationship of the parties, to lead her to believe that her son was likely to oust defendant from the home, was also a circumstance indicating the result of undue influence upon the mind of the grantor.

[7] ID.—CONVEYANCE INTER VIVOS—UNDUE INFLUENCE—EVIDENCE—FINDINGS—JUDGMENT.—In this action to set aside a deed of conveyance *inter vivos,* the evidence as to the relationship of the grantor and grantee, the mental and physical infirmities of the grantor, her age, the diversity between the disposition of her

4.　See 9 Cal. Jur. 232.

property under said deed and under a will previously executed, the circumstances surrounding the execution and delay in recording said deed, and the conduct of the grantee after obtaining said deed, was amply sufficient to support findings and judgment to the effect that said deed was the result of undue influence.

(1) 18 **C. J.**, p. 237, n. 98, p. 424, n. 18, p. 425, n. 23, 24, p. 446, n. 35. (2) 18 **C. J.**, p. 236, n. 70, 76. (3) 18 **C. J.**, p. 237, n. 81. (4) 18 **C. J.**, p. 425, n. 24; 28 **C. J.**, p. 671, n. 44. (5) 18 **C. J.**, p. 434, n. 96. (6) 18 **C. J.**, p. 434, n. 95. (7) 18 **C. J.**, p. 434, n. 92, 93, p. 445, n. 34.

APPEAL from a judgment of the Superior Court of Merced County. E. N. Rector, Judge. Affirmed.

The facts are stated in the opinion of the court.

F. W. Henderson for Appellant.

Edward Bickmore for Respondent.

THOMPSON, J., *pro tem.*—This is an appeal from a judgment canceling a deed of conveyance upon the ground of undue influence. The complaint also charged that the deed was the product of an unsound mind, and that it was procured by fraud. Upon both of these last-mentioned issues the trial court found for the defendant. The only question involved in this appeal is whether the findings and judgment are supported by the evidence.

For many years prior to the execution of the deed in question Madura Coyle, an old, partially blind and feeble widow, resided with her grandson, Hartley Kruger, at her home in Gustine, where he had lived since his childhood days. She had been twice married, and both of her husbands were dead. Her other relatives consisted of a son, S. Longmire, and his family, who lived at Turlock, and one other grandson, Roy Kruger, the brother of defendant. The grantor owned the premises where they resided, which was valued at three thousand dollars. She also had about one thousand dollars cash in bank. For many years both Hartley and Roy Kruger lived with their grandmother, who treated them as a mother would deal toward her own natural children. Some ten years prior to the making of the deed in question Roy married and established a home

of his own, while Hartley continued to live with his grandmother, looking after her personal needs and household affairs, but living largely upon her money. She held a deep regard for Hartley and reposed great confidence in him, authorizing him to draw checks upon her bank account. She declared her preference for him because he had always remained with her, and she felt that she could rely upon him. She was accustomed to make frequent visits to her son's home at Turlock, where she remained for weeks at a time. She appeared to be upon excellent terms with all of her relatives.

There is some conflict as to her physical condition, but it satisfactorily appears that she was eighty-six years of age, nearly blind, feeble and helpless, wandering about her home with a cane, and sometimes becoming lost in going from room to room. She was frequently ill and her memory was poor. Her attending physician testified that she was afflicted with a complication of ailments, including high blood-pressure, indigestion, together with liver and kidney complaints; she fell in occasional spasms and lay unconscious for many hours. These spells occurred almost daily toward the latter portion of her life. Several witnesses referred to her as feeble-minded, old, or stupid. She was often forgetful, confused, and erratic. Evidently she was greatly impaired, mentally and physically, from both age and disease.

The defendant testified that in April, 1921, his grandmother told him she wanted to fix her property so there would be no dispute over it, after she was gone, and for that purpose she sent him to summon a lawyer, together with her son, S. Longmire, who subsequently met at her home, where her will was prepared and executed. Her son testified that he never spoke to her about disposing of her property by will or otherwise, and, upon the contrary, that he considered her incompetent to make a will, yet he did not interfere with her purpose, nor attempt to suggest how she should divide her property.

Mabel Burg, a daughter of plaintiff, testified that at the time of the making of the will in April, 1921, her grandmother had said that she wanted to give one-half of her property to her son and one-fourth to each of her grandsons, but that the defendant said to her, "No, you make

it one-third; you make it one-third." And the witness concluded by saying, "And so she made it one-third to each." The son, Mr. Longmire, took no part in arranging for or making the will. The defendant testified that after the will was executed the attorney took it away with him, although he contradicted this statement, and said that he rarely ever took charge of a will and he did not remember taking this one with him. At least the will was never again seen and its disappearance is not accounted for.

Immediately after making her will Mrs. Coyle went to live with her son at Turlock. During the twenty months in which she lived with her son she made occasional brief visits to her home in Gustine. The defendant usually took her back and forth in his machine. At the time of the execution of the deed in question the defendant went to Turlock and took his grandmother to her home, where she remained for one week. No one except the grantor and the defendant occupied the home during this period of time. During this visit, and on September 10, 1921, the defendant procured Mr. Perrier, an attorney residing at Gustine, to prepare a gift deed from Mrs. Coyle to the defendant and bring it to the home to be executed. The defendant furnished all the information, including the description of the property, from which the deed was prepared. Mr. Perrier was the same attorney whom the defendant had procured to prepare the will some six months previous. Mrs. Coyle had never met this attorney except upon these two occasions, and had not counseled with him about either transaction. Having prepared the deed, the attorney brought it to the house, where he found the grantor in the presence of defendant and his friend Mr. Davenport. The conversation regarding the execution of the deed was testified to by Mr. Perrier, and was not only exceedingly brief, but indicated prearrangement and a thorough understanding between himself and the defendant. The old lady had no opportunity for consultation or independent advice. Her replies to his inquiries throw very little light upon her understanding. He said: "I went to Mrs. Coyle's house, . . . I would not really state who asked me to go. I went down that morning with the deed, and Mrs. Coyle was in the room, and I said to her, 'Do you wish me to make you a deed of this property to Hartley Kruger?'"

And she said, 'I do,' or words to that effect. I said, 'You understand that in deeding this over you are giving the property to him?' And she said to me 'I do.' I said, 'You are ready, then, to sign this deed?' And she said 'I am.' And I said 'All right, if you'll just come over here and sign it.' . . . She was unable to write, so she made a mark, and I wrote her name. . . . We signed, myself, as far as I can remember, and Mr. Davenport. . . . That was about all that was said in my presence, about the deed."

As to her competency, he said: "Q. In your opinion, at the time of the execution of this instrument, was she mentally competent to make a deed? A. I would have no reason to say she was not. I would not be in a position to say, one way or another; it's a hard question to answer; by taking the time—the short time I was there—it was just perfect." The attorney testified that he had met the grantor before, but never had any conversation with her. The only evidence of any previous meeting between them was at the time of the execution of the will. After the execution of the deed it was handed to the defendant, who said nothing about it to the Longmire family, and who failed to record it for some six months, and until he heard that plaintiff was searching the record to discover it, having learned of its existence from other sources. Immediately upon procuring this deed the defendant took his grandmother back to the home of her son at Turlock, saying that she required personal attention and he had no means of taking care of her.

Several months later, during the following spring, the defendant and his brother Roy met their grandmother at the Longmire home in Turlock. The defendant testified that on this occasion his brother Roy asked Mrs. Coyle why she had made this deed. And the defendant then said: "I told her she didn't need to answer the question if she didn't want to, but she said it was her own property and she thought she had a right to do what she pleased with it."

One Wassum, a neighbor, who was present at this conversation, said, she asked the defendant why he had not been satisfied with a child's share of the property and that he replied, "I have got that deed, and I'm going to keep it. I have got Roy where I want him now, and I'll make a good dog out of him; they'll have to come to me from

now on." This witness then asked Mrs. Coyle if she had really deeded the property away and she replied: "Not that I know of, but they say I have." This last statement of the grantor was corroborated by other witnesses. Referring to the making of the will, Roy asked his grandmother if she wanted to divide her property one-third each, and she said: "No, she wanted to give her son one-half, and one-quarter each, to her grandsons, but that he (the defendant) made her draw it up, one-third each."

Mr. Longmire, the plaintiff, testified that long prior to his mother's death she urged him to have the deed set aside, and that she always told him, she did not remember making the deed. Subsequently, upon proceedings duly had, he was appointed and qualified as her guardian, and immediately commenced an action to set aside the deed. Pending this suit she died; he was appointed administrator of her estate, and as such was substituted as plaintiff and continued the proceeding.

Upon this evidence the trial court found the issues of unsound mind and fraud to be untrue, but upon the second cause of action found in favor of plaintiff, as follows: "That Madura Coyle was of weak and vacillating mind, by reason of extreme old age, illness, physical weakness, and a feeling of dependency, and by reason of said mental weakness was easily susceptible to the influence of others. . . . That by reason thereof, on September 10th, 1921, the defendant . . . acquired a dominating and controlling influence over the mind and actions of the said Madura Coyle, which . . . overpowered the mind and will, and . . . did cause (her) . . . to execute the alleged deed. That said instrument was not the deed of Madura Coyle, and was not executed by her of her own free will and accord, but that the same was executed under the undue influence of defendant. . . . " Following these findings a judgment was rendered and entered setting aside the deed as void.

The appellant asserts that there is no substantial evidence in this record to support the contention that undue influence was actually exerted upon the grantor to procure the deed in question; that mere opportunity to employ such influence, or mere inference that it may have been used, is insufficient *to* warrant the cancellation of a deed. In support of his contention the appellant cites *Broaddus* v. *James*, 13 Cal.

App. 472 [110 Pac. 161], which was an appeal from a judgment upholding a deed of gift from a mother to her daughter, in which the court said: "The mere relation of parent and child is not sufficient to invalidate a deed from the former to the latter. It is a circumstance, of course, inviting careful consideration to the transaction, but before it can justify the inference of undue influence there must be added, imposition, fraud, importunity, or something of that kind. It is so expressed in 2 Pomeroy's Equity Jurisprudence, section 962, and in *Mackall* v. *Mackall*, 135 U. S. 167 [34 L. Ed. 84, 10 Sup. Ct. Rep. 705, see, also, Rose's U. S. Notes]."

In the text of Pomeroy's Equity Jurisprudence, above referred to, after discussing the subject of conveyances from a child to a parent, the author says: "Where the positions of the two parties are reversed, where the parent is aged, infirm, or otherwise in a condition of dependence upon his own child, and the child occupies a corresponding relation of authority, conveyances conferring benefits upon the child, will be set aside. Cases of this kind plainly turn upon the exercise of actual undue influence, and not upon any presumption of invalidity; a gift from parent to child is certainly not presumed to be invalid."

[1] Unquestionably this is the rule of equity, and a deed of conveyance from a parent to a child is not presumed to be invalid. Indeed, without further facts, just the contrary is true, and such a deed is presumed to be valid. (3 Thompson on Real Property, 1052, sec. 2886; 2 Pomeroy's Equity Jurisprudence, 4th ed., 2076, sec. 962.)

But where the parent is aged, infirm, or otherwise in a condition of dependency upon the child, who exercises authority over him, a presumption arises which places the burden upon the beneficiary of the gift conveyance, to show the transaction was fair and free from fraud. Equity will scrutinize such a transaction with great care, and under such circumstances slight evidence will suffice upon which to base a finding of undue influence and set aside the deed. (18 C. J. 445, sec. 552; 3 Thompson on Real Property, 1040, secs. 2877–2879; *Soberanes* v. *Soberanes*, 97 Cal. 140 [31 Pac. 910]; *Richards* v. *Donner*, 72 Cal. 207 [13 Pac. 584]; *Carleton* v. *Bonham*, 60 Cal. App. 725, 739 [214

Pac. 503]; *Nobles* v. *Hutton,* 7 Cal. App. 14 [93 Pac. 289]; *Becker* v. *Schwerdtle,* 6 Cal. App. 462 [92 Pac. 398].)

In the case of *Campbell* v. *Genshlea,* 180 Cal. 213, 224 [180 Pac. 336], it is said: "It is to be remembered that in a case involving a purported gift *inter vivos,* based upon an alleged consideration of love and affection, where the donee is a daughter having the control and direction of the aged donor, a strong presumption of confidential relations arises, which would place upon the beneficiary in the transaction the burden of showing fairness in dealing, and full understanding on the part of the person parting with the property. (*Nobles* v. *Hutton,* 7 Cal. App. 14 [93 Pac. 289].) In the absence of such showing, the conveyance is presumed to have been obtained by undue influence, and to be void. (*Piercy* v. *Piercy,* 18 Cal. App. 751 [124 Pac. 561]; *Odell* v. *Moss,* 130 Cal 352 [62 Pac. 555]; *Ross* v. *Conway,* 92 Cal. 632 [28 Pac. 785].)" And in section 2877 of Thompson on Real Property, Id., it is said: "Weakness of mind furnishes ground of suspicion of improper influence, and therefore, if an unfair advantage over the grantor can be shown or inferred from the circumstances of the transaction, a court of equity will afford relief against it."

*Harding* v. *Handy,* 11 Wheat. (U. S.) 103 [6 L. Ed. 429, see, also, Rose's U. S. Notes], is authority for the statement that: "Extreme weakness will raise an almost necessary presumption of imposition, even when it stops short of legal incapacity; and though the contract in the ordinary course of things, reasonably made with such a person, might be admitted to stand, yet, if it should appear to be of such nature as that such a person could not be capable of measuring its extent or importance, its reasonableness or its value, fully and fairly, it cannot be that the law is so much at variance with common sense as to uphold it."

[2] With respect to the character of evidence which it is necessary to adduce under circumstances similar to those presented in the case at bar, Mr. Tiffany, the author of that excellent authority on Real Property, in volume 2, second edition, page 1640, section 439, says: "A conveyance may also be set aside on account of undue influence exerted upon the grantor. Any influence brought to bear upon a person entering into an agreement, or consenting to a disposal of property, which having regard to the age and

capacity of the party, the nature of the transaction, and all the circumstances of the case, appears to have been such as to preclude the exercise of free and deliberate judgment, is considered by courts of equity to be undue influence, and is a ground for setting aside the act procured by its employment. The fact that the parties stand in such a position toward one another, either by reason of relationship, professional employment, or otherwise, that the grantor is peculiarly susceptible to the exertion of influence by the grantee, is a consideration of primary importance in this connection, in cases where the transaction is in itself improvident or disadvantageous to the grantor. And the fact that the grantor is lacking in such mental vigor as to enable him to protect himself against imposition is a reason for the interposition of equity to protect him, although the mental weakness is not such as to justify him in being regarded as totally incapacitated.''

The Civil Code, section 1575, defines undue influence, and subdivision 2 of that section reads, ''Undue influence consists in taking an unfair advantage of another's weakness of mind.''

[3] The question of what constitutes sufficient proof of undue influence depends upon the facts and circumstances of each particular case. (3 Thompson on Real Property, sec. 2876; *Shipman* v. *Furniss*, 69 Ala. 555 [44 Am. Rep. 528, 533].) Quoting from the last-mentioned citation, this language is used: ''What constitutes undue influence depends upon the circumstances of each particular case. It is a species of constructive fraud which the courts will not undertake to define by any fixed principles, lest the very definition itself furnish a finger-board pointing out the path by which it may be evaded.'' (Bigelow on Frauds, 283; 1 Redfield on Wills, 530.)

*Estate of Donovan,* 140 Cal. 390 [73 Pac. 1081], is relied upon by appellant as authority for his contention that the bare fact that the grantor and grantee occupied the relationship of *loco parentis,* and that the grantee had the opportunity to exert undue influence, and received the benefit of the conveyance, is insufficient upon which to set aside a deed, but that there must have been a showing of actual pressure which overpowered the mind and mastered the volition of the grantor, by such proof as is inconsistent

with absence of undue influence, or the deed will be held to be valid. (*Estate of Kendrick,* 130 Cal. 360, 368 [62 Pac. 605]; *Estate of McDevitt,* 95 Cal. 17, 34 [30 Pac. 101]; *Estate of Carithers,* 156 Cal. 428 [105 Pac. 127]; *Estate of Baird,* 176 Cal. 381 [168 Pac. 561]; *Estate of Anderson,* 185 Cal. 700 [198 Pac. 407].) **[4]** But the law makes a clear distinction between the proof of the existence of undue influence necessary to set aside a will and that which is required to cancel a deed of gift or conveyance *inter vivos.* No presumptions of undue influence are indulged in upon the contest of a will, unless confidential relations are first established; but with respect to gifts or conveyances *inter vivos,* the extreme age and infirmity of the grantor, together with slight evidence of circumstances from which it may be inferred that the instrument was the product of coercion, will suffice to shift the burden and require the beneficiary to show affirmatively that the transaction was fair and free from influence.

In the case of *Parfitt* v. *Lawless,* 27 English Law Reports (N. S.), 215, Lord Penzance, in a most interesting opinion on this subject, says: "In equity, persons standing in certain relations to one another, such as parent and child, man and wife, doctor and patient, attorney and client, confessor and penitent, guardian and ward, are subject to certain presumptions when transactions between them are brought in question; and if a gift or contract made in favor of him who holds the position of influence is impeached by him who is subject to that influence, the courts of equity cast upon the former the burden of proving that transaction was fairly conducted as though between strangers, that the weaker was not unduly impressed by the natural influence of the stronger, or the inexperienced over-reached by him of more mature intelligence. . . .

"The influence which is undue in the case of gifts *inter vivos,* is very different from that which is required to set aside a will. In the case of gifts *inter vivos,* it is considered by the courts of equity that the natural influence which such relations as those in question involve, exerted by those who possess it to obtain a benefit for themselves, is an undue influence. Gifts or contracts brought about by it are therefore set aside, unless the party benefited can show af-

firmatively that the other party to the transaction was placed in such a position as would enable him to form an absolutely free and unfettered judgment. The law regarding wills is very different.''

[5] The fact that the defendant did not record his deed for a considerable period of time, and that he then recorded it only when the plaintiff had discovered its existence and was searching for it in the records of the county, is a suspicious circumstance which tends to indicate guilty conscience of unfair means resorted to in procuring the instrument. (*Piercy* v. *Piercy*, 18 Cal. App. 751 [124 Pac. 561].)

[6] So, also, the radical change from the terms of the will, to an absolute conveyance of the bulk of her property, during the short period of six months, without any added knowledge on the part of the grantor, or any change in the relationship of the parties, to lead her to believe that her son was likely to oust defendant from his home, is also a circumstance indicating the result of undue influence upon her mind. In the case of *Teter* v. *Teter*, 59 W. Va. 449 [53 S. E. 779], the court says: ''That a disposition previously intended is wholly changed and altered, amounts to a circumstance, a fact, having direct and important bearing on the question of undue influence, where there is other evidence having a like tendency, is plain; but if there is a reason for it, or if there are facts and circumstances which the court can see may have been deemed by the grantor a sufficient ground for the change, the force and effect of the circumstances are, in reason, seriously broken and impaired, if not wholly overthrown.''

[7] In this case the grantor and grantee occupied a relationship equivalent to that of *loco parentis;* they had lived together in the same household for years; the grantor had implicit confidence in the grantee, even to the extent of permitting him to draw checks upon her bank account. She was eighty-six years of age, infirm, partially blind, mentally and physically impaired by age and sickness; the grantee was thirty-nine years of age and in the prime of health and vigor; the grantor previously made a will, the terms of which were radically changed by the deed in question, within the period of six months, without satisfactory explanation; the defendant obtained the bulk of the estate for the avowed consideration of love and affection; the deed was not recorded

until the son of the grantor discovered its existence; the will disappeared, and the deed was kept a secret for a period of time; the grantee brought the grantor from her home where she then resided with her son, and kept her in his home for a week, during which time no one else occupied the home; the grantee personally procured the attorney, giving him the information and description from which he drew the deed; the grantor never consulted with the attorney regarding the transaction; her son was kept in ignorance of the purpose of executing the deed; when the attorney brought the deed to the home, already prepared, the entire material part of his conversation regarding the deed consists of the following: "Do you wish me to make you a deed of this property to Hartley Kruger?" Answer, "I do." "You understand that in deeding this over, you are giving the property to him?" Answer, "I do." "You are ready to sign this deed?" Answer, "I am." And then he said, "If you'll just come here and sign it,"—which she did by mark, being unable to write because of infirmity and blindness. Immediately after securing the deed, the grantee returned his grandmother to her son's home, saying he had no means of taking care of her.

These circumstances furnish ample evidence to support a judgment to the effect that the deed was the result of undue influence.

The judgment is therefore affirmed.

Plummer, J., and Finch, P. J., concurred.