[Civ. No. 10168. First Appellate District, Division One.—August 21, 1936.]

In the Matter of the Estate of LILLIE J. MILLER, Deceased. JAMES C. MacFARLANE et al., Appellants, v. WILLIAM FARWELL, as Executor, etc., Respondent.

Charles A. Thompson and Robley E. Morgan for Appellants.

Owen D. Richardson and Donald B. Richardson for Respondent.

BRAY, J., *pro tem.*—The will of the deceased was admitted to probate. In this will the appellants, who are the heirs at law and next of kin of said deceased, were disinherited. They filed a petition to revoke the probate of the will upon the grounds: First, that the testatrix was not of sound mind at the time of the execution of said will, and secondly, that it was obtained by the undue influence of William Farwell and Miss Blanche Carpenter. The lower court sustained their contention and revoked the probate of the will, from which order the respondent herein, William Farwell, appealed.

This appeal has this day been denied by the court (*post,* p. 154 [60 Pac. (2d) 498]). The respondent filed in the

lower court his first account as executor to which the appellants filed written exceptions, claiming that the respondent, as such executor, had failed to account for or charge himself with all the property of the estate coming into his possession or knowledge, and particularly excepted to the failure of the said executor to charge himself with the receipt of two building and loan accounts aggregating $6,959.88 in value, two diamond rings, one gold slug, one gold watch, and some silverware. Upon the issues formed by the account and the exceptions a hearing was had in the lower court and a judgment was rendered settling the first account and finding that the property above mentioned had been made the subject of gifts to the executor on the day before the death of the deceased and that the estate of said deceased had no interest therein. From the order settling the first account this appeal is taken. The question involved in this appeal is the validity of the alleged gift to William Farwell. The determination of this question involves three propositions: First, whether or not the deceased was of sound mind at the time of making the alleged gift; secondly, whether or not the alleged gift was obtained through undue influence; and thirdly, whether or not the deceased made Mr. Farwell a valid gift.

In view of our determination of the second and third propositions above mentioned, it is unnecessary to determine the question of the mental condition of the deceased, as our decision on the other two propositions is determinative of the rights of the parties. We will, therefore, confine this decision to the questions as to whether or not the alleged gift was obtained through undue influence, and whether or not a gift actually was made. The lower court found that there was a gift and that such gift was not obtained through undue influence. In view of the rule that the weight of the evidence is for the lower court to pass upon and that any finding which finds support in the evidence is to be upheld, provided there is substantial evidence to support the same, the question to be determined here is whether or not there was substantial evidence to support the findings of the court.

Respondent's witnesses alone were present at the making of the alleged gift, and it therefore becomes a question as to whether or not the circumstances as related by them con-

stitute in law the making of a gift and also whether or not such circumstances show substantial evidence that there was no undue influence. The circumstances under which the gift was made are as follows:

The decedent, Lillie J. Miller, had been a school teacher, and at the time of her death was about seventy years of age. She was for many years a member of a religious organization founded and conducted by the respondent, William Farwell, known as the Christian Assembly. This organization practiced and taught faith healing.

Eighteen months prior to her death she contracted the deadly disease of cancer, but constantly refused medical attention. The disease kept her confined to her home and for many months she was dependent upon the assistance of neighbors and friends in obtaining food and having the same prepared for her. For three to four years prior to her death she had remained away from the Christian Assembly and had no treatments from it.

Three months before her death the cancer had developed to such an extent that on the 25th day of June, 1934, the femur of her right leg collapsed of its own weight while deceased was standing, whereupon friends forced their way into the home of deceased and had her sent to the San Jose Hospital in San Jose, California, and she was put under the care of a physician. Upon her admission to the hospital X-rays were taken of the deceased which showed cancer involvements of her pelvis, right leg, spine and abdomen, and her right breast was entirely destroyed, leaving a large sloughing mass.

The cancer progressed considerably from her admission until her death, which occurred on September 21, 1934. For some time after her admission to the hospital she refused any medicants offered to relieve her pain, though it was evident to the physician that her pain was intense. Finally he received her permission to administer narcotics, which were accordingly given, and during the last two weeks of her life she was kept under the influence of opiates.

At the beginning of the last month of the life of deceased the cancer had progressed to such an extent that she developed twitchings and periods of irrationality to which the doctor attributed an extension of the cancer process to

the brain. No progress towards a cure of the cancer was ever made, but on the contrary, the cancer progressed.

About two or three weeks before her death, the deceased was called upon by the hospital credit manager for the purpose of collecting her bill due the hospital, and the call so upset her that the doctor suggested that deceased have some person arrange her business affairs so that the necessity for such calls would be obviated. At that time the deceased suggested that should any person be called, she wanted an attorney, whose mother she had known for many years, to be called; and accordingly the doctor communicated with him, but suggested that the attorney wait until a further call was made, due to the upset condition of the deceased on that day. No further call was made by the doctor, because, as he stated, the mental condition of the deceased rapidly grew worse to such an extent that he did not consider her competent to transact business.

On August 7, 1934, the deceased was visited by Miss Blanche Carpenter, a copastor in the religious organization headed by the respondent, and the assistant to the respondent in said organization, and thereafter said Blanche Carpenter administered faith-healing treatments to the deceased from one to two times a week until the death of the deceased.

On Tuesday, September 18th, three days before the death of deceased, Miss Carpenter, within twenty-six minutes after a dosage of morphine had been administered to deceased, broached to deceased the subject of having deceased arrange her business affairs, and at that time decedent objected to making a will, but stated she wanted to have deeds of trust drawn. Miss Carpenter at the time, according to her testimony, told deceased that there were three ways of arranging her business affairs without making a will, and inquired of deceased why she had not arranged her affairs, telling her that a person who is ill and in a hospital should arrange one's affairs. The deceased, according to Miss Carpenter, then informed Miss Carpenter that she, the deceased, did not know an honest lawyer. Miss Carpenter thereupon suggested the name of Mr. Owen D. Richardson, the attorney for Miss Carpenter, and the attorney for the respondent, and the attorney for the Christian Assembly (having been such for ten years) as an attorney who could advise her, and

Miss Carpenter at that time also suggested that deceased have a talk with Mr. Farwell, who could advise deceased on business matters.

The deceased acquiesced to having a conversation with Mr. Richardson and Mr. Farwell, and accordingly on the next day, September 19th, Mr. Farwell, Mr. Richardson, his attorney, and Miss Carpenter called upon deceased.

On that occasion the deceased objected to making a will and stated that she wanted deeds of trust drawn covering all her real and personal property, whereby the respondent, upon the death of deceased, was to pay two bequests of $2,600 in the aggregate, pay all bills of deceased and all her other obligations, and turn the residue over to the Christian Assembly. It also appears that the deceased requested Mr. Farwell to take charge of all her business affairs, pay all her bills and accounts, and if she recovered, turn all the property back to deceased.

Mr. Richardson, the attorney, then informed deceased that she could not leave the balance of her property to the Christian Assembly as it was a charitable institution and stated to the deceased, "You will have to give it to Mr. Farwell without any strings on it" and then suggested that a tentative will be drawn covering the terms of the proposed trust and that he would prepare such a will to hold until he could secure descriptions of her property and prepare the necessary trust agreement.

Such a will was drawn and executed on the afternoon of the 19th of September. (This is the will which, as hereinbefore mentioned, was set aside.) Thereupon the respondent went to a Mrs. Morrison, who had been keeping the deceased's personal property, and secured possession of the two building and loan books from Mrs. Morrison by telling her that he had been appointed executor of the estate of said deceased. On September 20th, eleven hours before decedent's death, he presented the books to deceased, prepared assignments of the same, together with two orders for delivery of the silverware and keys to the safe deposit box, and told deceased that her signatures to the same were necessary to carry out her wishes of the day before, and that the trust agreement was being prepared; whereupon deceased signed books and orders. It is as to the validity of the transfer of these books and the personal property at

the same time, that this controversy arose. On that evening respondent presented to deceased a deed, absolute in form, which would have conveyed title to him of all her real and personal property, and told her that it was the *trust* deed which Mr. Richardson had prepared. However, deceased was unable to sign the same, being in a stupor and physically unable to sign the same. On the next day, at 10:20 A. M. deceased passed away.

There was considerable testimony in the case as to the mental condition of the deceased, by her doctor, her nurses and intimate acquaintances, which was contradictory to the claims of the respondent and his witnesses. This testimony is not being referred to herein for the reason that, as before stated, we find it unnecessary to determine the question of the condition of her mind. However, in determining the questions here involved, it is well to bear in mind that the deceased was an elderly woman in bad physical condition.

While all the testimony concerning the happenings at the time of the making of the alleged will and the alleged delivery of the building and loan deposit books came from the respondent's witnesses and there is no substantial conflict in the testimony of these witnesses, the only reasonable interpretation of this testimony is that the gifts were not freely and voluntarily made and that they were obtained through the undue influence of William Farwell and Blanche Carpenter. A fiduciary relationship existed between these latter and the deceased. William Farwell was her spiritual adviser. In addition, he became her business manager, undertaking to handle her property for her. Blanche Carpenter was a copastor in the church and as such was treating the deceased through mental healing and was likewise attempting to advise her in her business matters. Where such fiduciary relationship exists and as a result thereof a substantial advantage is gained, there is a presumption of undue influence which is not overcome by the testimony in this case. As held in *Bohn* v. *Gruver,* 111 Cal. App. 386, 394 [295 Pac. 891], "though the burden of proof usually rests upon the person asserting fraud or undue influence, yet with respect to gifts or conveyances *inter vivos* where a relation of trust and confidence exists between the parties the extreme age and infirmity of the grantor, together with slight evidence of circumstances from which it may be in-

ferred that the gift or conveyance was the product of coercion, will suffice to shift the burden and require the beneficiary to show affirmatively that the transaction was fair and free from undue influence. And this rule applies not only to those who bear a formal relation of trust to those with whom they deal, but in every case where there has been confidence reposed which invests the person trusted with an advantage in treating with the person so confiding (*Longmire* v. *Kruger, supra,* (80 Cal. App. 230 [251 Pac. 692]; *Cox* v. *Schnerr, supra,* (172 Cal. 371 [156 Pac. 509]); *Schurman* v. *Look,* 63 Cal. App. 347 [218 Pac. 624])."

While the record discloses no direct evidence of active influence being brought to bear to obtain possession of the books, other than the statement of the respondent to the deceased that it was necessary for her to assign them in order to carry out her wishes of the day before, the respondent did not meet the burden of showing the transaction to be fair and free from undue influence. It appears clearly from the testimony without any substantial evidence or inference to the contrary, that the deceased, at the time that the respondent, his copastor and his attorney came to see the deceased about making a will, had no intention of making any gift to the respondent. In that meeting it is clear that she desired the respondent to take charge of her business affairs for her, but to return her property to her, in the event that she should live, and, in the event that she should die, that he should hold it in trust, under conditions to be included in a written trust agreement, for certain specified purposes, to pay certain bequests and to give the balance to the Christian Assembly. She was informed that she could not give the balance of her property to the Christian Assembly, and while the reasonable inference to be drawn from the whole transaction is that she still believed that what was being done for her by the attorney was the making of some arrangement by which the Christian Assembly would eventually get the property, still for the purposes of this matter we will have to assume that the trust discussed but not completed, contemplated that the residue was to go to Mr. Farwell. The next day when the respondent and Miss Carpenter appeared before the deceased with the building and loan books there is no dispute of the fact

that he told her that it was necessary for her to sign the assignments which he had, and to give him the books, in order to carry into effect her desires of the previous day. There was at no time any suggestion that these documents were to be given to him other than in pursuance of the discussion of the previous day. Respondent's counsel takes the position that there was an out-and-out gift to respondent, *inter vivos,* not *causa mortis,* and not in trust. The respondent testified that the gift was to him in trust, but his counsel now contends this was merely meant to refer to a moral obligation. There is not one word of evidence showing any intention or desire on the part of the testator to make a gift to respondent individually. The most that could be said of the evidence is that it shows that the deceased intended that the gift was to be in pursuance of a trust to be thereafter created. The trust not having been created, there can be no valid gift.

 It was definitely a part of the previous day's understanding that in the event the deceased lived she should have her property back. Therefore, when the next day the respondent told her it was necessary for her to make the assignments of the building and loan books to carry out the wishes of the previous day, there could be no valid gift as the deceased had no intention of completely parting with her property. This alone would defeat a gift *inter vivos.* Under the testimony, the deceased could have had in mind only that the signing over of the books was either to carry out the trust arrangement to be later reduced to writing, or, what is more probable, in order to enable Mr. Farwell to take immediate charge of her business affairs as had been arranged on the previous day. It is significant that while the attorney was to prepare the necessary papers in connection with the trust, the respondent himself prepared and arranged for the signing of the assignment and the transfer of the books without any knowledge upon the part of the attorney. The exact details of the terms of the trust agreement were not completely decided upon, and, according to the testimony of the attorney, were to be determined when he brought back the form of the trust agreement.

 The testimony clearly shows a woman in the last stages of cancer, drugged with opiates for several weeks, whose spiritual adviser three days before her death sug-

gested the name of the attorney, who was the personal attorney of the respondent for many years, as well as the attorney for the Christian Assembly, and also suggested that the deceased interview the respondent, who had been her pastor, for advice in business matters; that on the next day the attorney, the spiritual adviser and the respondent went to the bedside of the deceased, who stated that she did not want to make a will but wanted respondent to take charge of her business affairs, pay her bills and accounts and after her death pay two bequests and turn over the balance to the religious organization represented by the two spiritual advisers, and that if she lived, to return the property to her. The attorney then advised deceased that she could not will her property to the Christian Assembly, although she was not contemplating a will and expressly objected to it, and then told her that she would *have* to give the property to respondent; that thereupon she is persuaded to make a will. She is not asked concerning who her relatives are or whether when she finds that she cannot leave her property to the Christian Assembly, who else she would like to leave it to, but is told that she must leave it to respondent; that then the attorney promises to make a trust agreement in accordance with her wishes; that nothing was said or done on that day concerning any gifts to respondent; that on the next day the respondent, having obtained possession of the two building and loan passbooks and having written two orders, one for silverware, the other for keys to her safe deposit box, in the company of Miss Carpenter presented the passbooks and orders to the deceased, and told her that it was necessary for her to sign these orders in order to carry out her desires of the previous day. Later that same day he presented to the deceased a deed, absolute in form, and told deceased that it was the trust deed that she had requested the attorney to prepare. The testimony shows without contradiction that the property in dispute was not transferred by deceased, either voluntarily or freely, but was procured through the undue influence of respondent and Miss Carpenter, and that the intention of the deceased in signing the assignments of the building and loan books was to turn them over to him so that he could manage her affairs and could carry out the trust to be executed between the deceased and the respondent, the exact terms of which

would be determined when the attorney presented the form of the agreement. The deceased at no time had any independent advice, but at all times in connection with this transaction was surrounded by persons bearing a fiduciary relationship and who stood to benefit by the transfers. ■

Where a confidential relationship exists between the parties, coupled with activity on the part of the grantee in preparation of the grant, the presumption of undue influence arises and the burden of proof shifts to the donee to show that no undue influence is used. (*Estate of Nutt*, 181 Cal. 522 [185 Pac. 393].) Confidential relations are presumed to exist between priest and parishioner, principal and agent, counsel and client, and in each of said relations the party in whom the confidence is reposed must stand in his dealings with the other party unimpeached of the slightest abuse of the confidence reposed, and if he derives or claims any advantage from the relation the law places upon him the burden of showing that the transaction out of which the advantage arose was fair and just and fully understood and consented to by the party confiding in him. (*Bacon* v. *Soule*, 19 Cal. App. 428, 434 [126 Pac. 384].)

"That the influence which the spiritual adviser of one who is about to die has over such person is one of the most powerful that can be exercised upon the human mind, especially if such mind is impaired by physical weakness, is so consonant with human experience as to need no more than its statement; and *in any* transaction between them wherein the adviser receives any advantage, a court of equity will not enter into an investigation of the *extent* to which such influence has been exercised. Any dealing between them under such circumstances will be set aside as contrary to all principles of equity, whether the benefit accrue to the adviser or to some other recipient who, through such influence, may have been made the beneficiary of the transaction." (Italics ours.) (*Ross* v. *Conway*, 92 Cal. 632, 636 [28 Pac. 785].)

■ The testimony in this case shows that the respondent in whom a confidence was reposed by the deceased used such confidence for the purpose of obtaining an unfair advantage over the deceased. This constitutes undue influence. (Sec. 1575, Civ. Code.)

As before pointed out, there is no evidence showing any intention on the part of the deceased to make respondent a gift of the property in controversy. The intent to make a gift is an essential element to constitute a gift. (Cal. Jur., vol. 13, p. 36; *Hotaling* v. *Hotaling,* 193 Cal. 368 [224 Pac. 455, 56 A. L. R. 734].)

The testimony clearly shows that the deceased never intended to make any transfer of a part of only of her property. It clearly shows that she intended that all of her property was to go into the trust arrangement and the trust arrangement never having been completed, and all of her property not having been transferred in trust, that which the respondent received upon the representation to her that it was carrying out her wishes of the day before would fall because it was not complete. As stated in *Knight* v. *Tripp,* 121 Cal. 674 [54 Pac. 267], the failure of respondent to obtain the property, other than the money, for want of a delivery in the lifetime of the deceased and the failure to execute the trust agreement causes the entire purpose to fail. Unless the gift can be maintained as a whole the failure of the principal part must be defeated entirely. The deceased at all times maintained the right of dominion over the property which the respondent received. This is fatal to the legality of a gift. (*Sullivan* v. *Shea,* 32 Cal. App. 369, 371 [162 Pac. 925].)

The presumption of undue influence arose by reason of the relationship of the parties and this presumption has not been overcome by the evidence. Moreover, the evidence establishes that there was no valid gift. Therefore, the property in question was the property of the estate and should have been accounted for by the executor.

In the lower court, no objection was made to the appearance of the appellants in the case and no claim was made that they had no interest in the estate. It was conceded that they were the brothers and sister respectively of the deceased. In the findings there was inserted the following: "7. The Court further finds that no evidence was offered tending to prove that James C. MacFarlane, William MacFarlane and Mary Manson, or any of them, are heirs at law or next of kin of the deceased." This, of course, is not a finding that they are not heirs at law or next of kin. Apparently the respondent attempts to raise the question

of the interest of the appellants for the first time upon appeal. This respondent cannot do. (*Estate of Robinson*, 106 Cal. 493, 497 [39 Pac. 862]; *Estate of Willey*, 140 Cal. 238, 243 [73 Pac. 998].)

The order setting aside and allowing the first account of the respondent William Farwell as executor of the last will and testament of Lillie J. Miller, deceased, is set aside and the lower court is directed to require said executor to account for and include in the assets of the estate of said deceased the following property to wit: 1. The account with the Independent Loan Association in the sum of $3,044; 2. The account with the Surety Building & Loan Association in the sum of $3,915.88; 3. The two diamond rings; 4. One gold watch; 5. One gold slug; 6. Miscellaneous silverware.

Tyler, P. J., and Cashin, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on September 19, 1936, and an application by respondent to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on October 19, 1936.