[Civ. No. 8087. Third Dist. Sept. 20, 1952.]

Estate of FRANK WEBER, Deceased. ATHENS MASONIC LODGE et al., Respondents, v. THOMAS B. LEEPER, Appellant.

162

Thomas B. Leeper, in pro. per., for Appellant.

Downey, Brand, Seymour & Rohwer, J. Clark Benson, Fontaine Johnson, Chalmers, Cowing & Sans, Busick & Busick, Carl E. Rodegerdts, Means & Roach and White & Harber for Respondents.

SCHOTTKY, J. pro tem.—Frank Weber, a resident of Yolo County and a large landowner, died on November 17, 1949, at the age of 83. He left an estate of the appraised value of $597,020.28. For the last 20 years or more of his life he roomed and boarded at the Beltrami Hotel in Broderick, Yolo County, the property being owned by Mr. Weber and the hotel being operated by his tenant, Mrs. Irene Beltrami. There

were three sons in the Beltrami family, whose names and ages at the time of Weber's death were William, 27; Nichola, 30; and Dino, 32.

About two years prior to his death Weber began to gradually weaken physically, so that during the last seven or eight months of his life he had difficulty in walking alone and usually had someone accompany him and hold his arm so he would not fall. In October, 1947, Weber employed William Beltrami to take care of his books, drive him to his ranches and other places, and during the last year of Weber's life, as Weber's physical condition declined, William Beltrami assisted him to dress and acted as his nurse, companion and general helper, receiving for such services the sum of $200 per month. Weber had never married and left no issue or other heirs.

On November 22, 1949, William Beltrami filed a petition for probate of a will of Frank Weber dated May 27, 1949, which will made specific bequests to three children's homes, three lodges, to the members of the Beltrami family and to several other persons. The residue was left to three children's homes and lodges and William Beltrami was named as executor. Under this will Beltrami would receive approximately $70,000.

On December 8, 1949, appellant Thomas B. Leeper, who had been Weber's attorney for 35 years, filed a petition for probate of a document, dated July 20, 1949, purporting to be a copy of the will of Frank Weber, said petition alleging that the original will had been lost after the death of Weber. Said document made specific bequests to a number of children's and fraternal organizations, to the members of the Beltrami family, to appellant Leeper and a large number of other persons. The residue was left one-half to Leeper and one-half to William Beltrami, who were also named as executors. Under this will appellant Leeper would receive approximately $200,000, and Beltrami approximately $145,000.

Appellant. Thomas B. Leeper filed a contest to the will of May 27, 1949, upon the ground that it was executed by Weber while under the undue influence of William Beltrami, and the respondents Athens Masonic Lodge, Shriners Hospital for Crippled Children, and Independent Order of 'Odd Fellows' Children's Home, who were legatees and residuary legatees under the May 27, 1949, will, each filed a contest of the purported July 20, 1949, will, opposing the probate of said last will on various grounds. However, prior to the trial each contestant dismissed all of the causes of action except the one

that the deceased never executed the purported will of July 20, 1949.

It was stipulated by the opposing parties that the contest to the July 20, 1949, will should be tried first, and that in the trial of said contest the order of proof should be as follows: "Proponents of said will shall first introduce such evidence as they may desire to establish their prima facie case for the admission of said Will to probate. Such evidence shall be presented before the jury, and the witnesses testifying as a part of said evidence shall be subject to cross-examination by Contestants. After proponents have presented their prima facie case, Contestants shall proceed to present their case, following which Proponents shall introduce such further evidence as they may desire. Opening statements may be made by both Proponents and Contestants prior to the introduction of any of the evidence. In final argument Contestants shall open and close."

The procedure agreed upon by the parties is substantially in accord with that prescribed by our Supreme Court in the very recent case of *Swift* v. *Superior Court,* 39 Cal.2d 358, at page 364 [247 P.2d 6], as follows:

"In the interest of establishing a definite rule of procedure to be followed under such circumstances, we believe that it is appropriate for this court to declare that when a will is contested before probate and either party demands a jury trial of any issue as to which the right to a jury trial exists (Prob. Code, § 371) the trial court cannot proceed with any phase of the hearing in the absence of a jury but must impanel a jury at the outset. Thereupon, the proponents of the will must make a prima facie showing that the will was executed in all particulars as required by the Probate Code."

Following a trial before a jury a verdict was rendered on October 19, 1950, that the will of July 20, 1949, was not executed by Frank Weber, and thereafter, on November 3, 1950, the court made and filed its findings of fact and conclusions of law and its judgment denying admission of the purported will to probate, Proponent Leeper's motions for a directed verdict, judgment notwithstanding the verdict, disqualification of the trial judge to hear the motion for a new trial, and for a new trial were denied and he has appealed from the judgment and from the orders denying each of said motions. He has also appealed from the order refusing to retax costs against him.

Appellant has filed an opening brief consisting of 192 pages and has filed no closing brief. Appellant has devoted 160 pages of his brief to his principal contention upon this appeal, which is that the evidence does not sustain the verdict and the judgment entered thereon.

As this court said in *Estate of Trefren*, 86 Cal.App. 2d 139, at pages 141-142 [194 P.2d 574]:

''In reviewing the sufficiency of the evidence in an action involving a will contest, the test to be applied by an appellate court is the same as that which applies on other appeals, namely, whether or not there is any substantial evidence to support the findings of the jury or trial court. All questions of the weight of the evidence and the credibility of the witnesses are for the jury and the trial court, and if there is any substantial evidence to support the verdict or finding it cannot be set aside by the reviewing court, although said court may believe the great preponderance of the evidence was the other way. (See *In re Pessagno's Estate*, 58 Cal.App.2d 390 [136 P.2d 644]; *Estate of Downey*, 51 Cal.App.2d 275 [124 P.2d 637]; *Estate of Hansen*, 38 Cal.App.2d 99 [100 P.2d 776]; *Estate of Miller*, 16 Cal.App.2d 141 [60 P.2d 492].) As in other cases involving the sufficiency of the evidence to sustain a verdict or finding, the power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the conclusion of the trier of the facts. All conflicts must be resolved in favor of the respondent and all legitimate and reasonable inferences indulged in to uphold the verdict if possible. When two or more inferences can be reasonably deduced from the facts, the reviewing court is without power to substitute its deductions for those of the trial judge or jury. (*Estate of Bristol*, 23 Cal.2d 221 [143 P.2d 689]; *Estate of Teel*, 25 Cal.2d 520 [154 P.2d 384].)

''As was said in the *Estate of Teel, supra*, at page 527:

'' 'All of the evidence most favorable to the respondent must be accepted as true, and that unfavorable discarded as not having sufficient verity to be accepted by the trier of fact. If the evidence so viewed is sufficient as a matter of law, the judgment must be affirmed.' ''

We shall first summarize briefly the evidence as testified to by the witnesses at the trial.

According to appellant and his witnesses, the following circumstances occurred as to the contested will of July 20, 1949. A few days prior to July 20th, Weber called on H. N.

Mitchell, an attorney with offices on the second floor of the Mitau Building in Sacramento, adjacent to appellant, for the purpose of making a new will. He had with him the prior wills of April 5, 1946, and January 22, 1949. The new will was to contain minor changes, and Mrs. Mecum, secretary of Mitchell, made notes on the two former wills to indicate these changes. The July 20th will was then typed by her, no rough draft being made. Thereafter on July 20th, Weber returned to Mitchell's office at some time between 11 o'clock and noon. Mrs. Mecum testified:

"MR. HUSTON: Mrs. Mecum, do you recall, on the July 20th, if—who accompanied Mr. Weber into Mr. Mitchell's office?

"THE WITNESS: I believe it was the taxi driver.

"Q. And did he just bring Mr. Mitchell—I mean Mr. Weber—into the office and then depart? A. He was gone for a while. And then he came back before Mr. Weber left. He left right away after he brought Mr. Weber in, he helped him sit down, and then he left. And he came back quite a while before Mr. Weber was ready to leave. He stood in the hall for a while. He came in and sat down for a while."

Mr. Mitchell, in his deposition, stated:

"Q. [By Mr. Downey]: Now, did Mr. Weber come right through the reception room into your room? A. No, he came to the reception room; somebody brought him upstairs and he came to the reception room, and Louise called me and told me he was there and I got up and went to the door.

"Q. Was he seated in the reception room when you first saw him? A. He, he was standing.

"Q. Was anyone standing there with him? A. Yes.

"Q. Who? A. I don't know, that taxi man.

"Q. And did Mr. Weber come on into your office then? A. Yes.

"Q. Did the taxi man come in with him? A. Yes, he assisted him in. He may not have been a taxi man. I do not know."

The will was read aloud in the presence of Mitchell and Mrs. Mecum. Shortly thereafter Yost and Greene arrived, being called as witnesses. Greene read the will and it was again read aloud. There were four witnesses to the will—Mitchell, Mecum, Yost and Greene. They testified that Weber signed and acknowledged the document as his last will, and that they witnessed the will in his presence and in the presence

of each other. After the will was executed it was left with Mr. Mitchell for safekeeping.

Weber died on Thursday, November 17, 1949. Appellant Leeper came to Mr. Mitchell's office on Friday, November 18th. They got out Mr. Weber's will dated July 20, 1949. Leeper had not seen it before, and looked it over and read it. He then told Mr. Mitchell to prepare a petition for probate. Mr. Mitchell was to be the attorney. Mrs. Mecum made a petition for probate on the following Monday. She used the original will in making copies for use in the probate proceedings. On leaving the office Monday night she placed the will in the file and placed the file on Mitchell's desk. On the following day the file was there, but the original will was gone. It has never been found.

Other witnesses corroborated the testimony of appellant and that given by the witnesses to the purported will of July 20, 1949. In all, nine witnesses testified to facts consistent with the claims of appellant. Mr. and Mrs. Dunstan testified that they saw Weber on July 20th and he stated that he had just made a will; witnesses O'Dell and Henderson testified they saw Weber in the Mitau Building on July 20th. It is respondents' position that these witnesses lied. In addition, witnesses Bliss and Lewis testified that the office force in Mitchell's office made an extensive search for the purported will of July 20th. It is respondents' position that this search was a smoke screen.

The principal witness for the contestants was William Beltrami. Under the will proposed by appellant, William would receive cash and properties valued at approximately $145,000. Other members of the Beltrami family would receive approximately $100,000, a total of $245,000 for the family. Under the May 27, 1949, will William would receive approximately $70,000, and other members of the family would receive $135,000, a total of $205,000 for the family.

The appellant made a will for Weber dated August 31, 1948. Under this will as in former wills the appellant received nothing. According to Beltrami, appellant approached him shortly before the August 31st will was executed and suggested they appropriate a large part of the Weber estate to themselves. Beltrami testified this was to be accomplished in the following manner: "He [Leeper] said, 'Well,' he said, 'I am going to take the back page of the August will and connect it on there,' he said, 'I didn't have any trouble getting Mr. Weber to sign two wills the last time he made a will. I

will just take that one and put in on there. If he doesn't sign but the one, you keep your eyes on it and you bring me the copy and I will take the back page off and put it on there. I am not going to number the pages. We can do that after while.' '' Beltrami did not accept the offer. He testified: ''Well, it was pretty tempting. And I went home that night and it bothered me a lot. I didn't sleep, hardly. The following day I went back up to his office. I told him I didn't want to have anything to do with it. I didn't want to take any chance of going to jail just to get hold of Weber's money. He said, 'There is no chance of going to jail. I have put a lot of people in this will to cast off a lot of suspicion. Mr. Weber didn't have any relatives. There is no one to start trouble.' And I said I didn't want to get mixed up in it. And he said, 'You will take $25,000.00, wouldn't you?' and I said, 'I will take $5.00 if it is left to me.' He said, 'Well, I will take care of that.' ''

William testified as to Weber's whereabouts on July 20, 1949, the date upon which appellant's witnesses claimed the contested will was executed. Attorney Rodegerdts of Woodland, who had drawn the will of May 27, 1949, had suggested to William that he keep a diary giving the names of the persons Weber saw and when he saw them. William testified that on the morning of July 20th he helped dress Weber and then drove him to the office of Dr. Rovane in Sacramento where Weber had an 11 a. m. appointment; that Weber was in the doctor's office for an hour and a half, or more, and then he drove Weber to the Dunstan Ranch about 12 miles east of Sacramento, which ranch was owned by Weber and operated by the Dunstans. His recollection was that they purchased some cup cakes on the way out and arrived at the ranch about 1 p. m. and remained there until 3:30 or 4 p. m., when they returned to the Beltrami Hotel. William testified positively that Weber was not in either Mitchell's office or Leeper's office at any time on that date. William's testimony was corroborated by Dr. Rovane who brought his office records to show the appointment and the examination made on that day, and also by Rex Hoag, a state pear inspector, who testified to seeing Weber at the Dunstan packing shed about 1 p. m. on that day.

Other parts of the testimony will be referred to in the course of this opinion but the foregoing will suffice to show the widely divergent positions taken by the opposing parties at the trial and the sharp conflict in the evidence. It was the

position of the contestants that the purported will of July 20, 1949, was fabricated by appellant and that two other wills, dated April 5, 1946, and January 22, 1949, which appellant claimed he prepared, were also fabrications. Appellant on the other hand contended that contestants' case was based almost entirely upon the testimony of William Beltrami and that his testimony was not worthy of belief.

Appellant has made a long and bitter attack upon the testimony of contestants' witnesses, and particularly upon the testimony of William Beltrami. Many statements are made which are not substantiated by the record, or are outside of the record, and it is apparent that appellant has to some extent drawn upon his personal recollection in his reference to asserted facts which do not appear in the record. It is to be noted that at the trial appellant was represented by an able and experienced member of the Woodland bar who conducted the entire trial, but that such counsel does not appear in any of the appeal proceedings, appellant's brief apparently having been prepared by himself.

Appellant's argument in effect is that the testimony of the four persons who testified that they witnessed the execution of the will, and the testimony of the other witnesses tending to corroborate them, was so strong as to render William Beltrami's testimony inherently improbable. If the verdict of the jury had been in favor of appellant his argument would be very helpful in pointing out evidence in support of such a verdict, but in view of the verdict of the jury upon the issue of the execution of the will the testimony pointed out by appellant merely accentuates the conflict in the testimony, and, as hereinbefore pointed out, it was the province of the jury to weigh the evidence. Therefore, we deem it unnecessary to discuss at any great length the argument of appellant as to the insufficiency of the evidence, And after a careful study of the record we are satisfied that the jury was fully justified in reaching its conclusion. For the testimony of appellant's witnesses discloses a situation and circumstances so unusual that even if such testimony were uncontradicted it could rationally be disbelieved by the jury.

█ Appellant contends that the court erred in admitting testimony of Lorraine Williams to the effect that in November, 1948, when Weber was a patient in her hospital, she had a conversation with him. She testified:

''In the meantime, he [Weber] told me he was leaving his property to he [William Beltrami] and the Masonic Home,

the Crippled Children and the Odd Fellows Home, and that was our conversation about that. He never mentioned Mr. Leeper at any time.''

The court in overruling the appellant's objection to these declarations stated: ''I am admitting them upon the same principle that I admitted those you offered,'' referring to the fact, as shown by the record, that former wills and declarations of Weber had been offered by both appellant and respondents and admitted by the court for the purpose of showing the pattern Weber had in mind in disposing of his property. There was no error in the admission of this testimony. Appellant himself testified at great length to numerous declarations of Weber which were favorable to him.

Appellant contends also that, in view of the fact that Mr. John Downey, counsel for respondents, in his opening statement charged that appellant had concocted a plot to get the contested will accepted, fraud and conspiracy should have been alleged in the contests, and therefore evidence of fraud and conspiracy was improperly admitted. He asserts that the only issue raised by the amended contests is that the will was not executed. There is no merit in this contention because where the execution of a will is denied, any evidence tending to throw light upon that issue, whether it also showed fraud or conspiracy, would be relevant.

Appellant urges also that the court erred in permitting contestants to call and interrogate William Beltrami under section 2055, Code of Civil Procedure. However, Beltrami was named as coexecutor of the contested will and was a substantial beneficiary thereunder, and as such was served with a copy of the contests and filed answers thereto. Even though in his answers he denied the material allegations of the contests on the ground that he did not have sufficient information or belief to enable him to answer them, he was still an adverse party within the meaning of said section 2055. There is no merit in this contention.

Following the filing of his motion for a new trial, appellant filed a motion under section 170 of the Code of Civil Procedure to disqualify the trial judge from sitting or acting upon the motion for a new trial or any further proceedings. Appellant in his affidavit in support of said motion alleged that the trial judge upon the invitation of contestants attended a victory celebration banquet at the end of the trial; that in the presence of a large group of people he directed the seating of the jury for the purpose of taking

pictures, and that he sat with the jurors, making himself obvious and important, showing himself gleeful and happy that contestants had won. It is also alleged that the judge showed a belligerent attitude in questioning appellant's witnesses and his actions carried the implications that he did not believe them. The affidavit of Judge McDonald denied that the questions asked by him were intended to influence the jury against appellant, or that such questions were prompted by bias and prejudice. As to the dining room incident, the judge's affidavit states: ''Further answering said Paragraph 4, alleges that, when the said Judge entered the said dining room, it was crowded; that among the first people he saw therein were Proponent and his counsel; that a long table was set in the center of the said room; that Mr. Fontaine Johnson invited said Judge to sit at said table; that said Judge took a seat at the southeast corner thereof and almost within arm's reach of Proponent and his said counsel; that some of the jurors were seated at other tables; that when the said photograph was taken, said Judge arose and stepped aside and permitted one of said jurors to occupy the chair formerly occupied by him to enable her to be photographed with the other jurors; that said Judge did not discuss the merits of the proceedings in the above matter with any of the jurors or with any of counsel.''

Counsel for respondents, in his affidavit in opposition to the motion to disqualify the trial judge, denied that the luncheon referred to was a victory luncheon, but admitted that the judge, the jury and the clerk and bailiff had been invited to lunch. Said affidavit stated further that the luncheon was in the main dining room of the Woodland Hotel; that the appellant Leeper and his counsel were at a table immediately adjacent to those occupied by the jurors, the judge, the court attachés and attorneys for contestant; and that there was no discussion whatever of the trial or the facts of the case.

The motion for disqualification was heard by a distinguished trial judge of more than 40 years' experience. After weighing the affidavits and hearing the arguments of respective counsel he found that Judge McDonald was not during the trial of the will contests or at any other time prejudiced against proponent Leeper and that he was not disqualified from acting in any proceedings theretofore had or to sit or act in proceedings had thereafter. These findings, based as they

are on conflicting evidence, are binding upon us. (*Ryan* v. *Welte*, 87 Cal.App.2d 888 [198 P.2d 351].)

While the record does show that the court did question some of the asserted subscribing witnesses to the contested will, the questions asked were all pertinent to the issue involved, and it does not appear that the trial judge showed any prejudice or bias against appellant.　　　The following language from *Estate of Dupont*, 60 Cal.App.2d 276, at page 289 [140 P.2d 866], is applicable to the instant case:

"Counsel for appellants, Hollingsworth, Reid and Lamb claim that the trial judge committed prejudicial error in questioning various witnesses, and in admonishing counsel not to interrupt witnesses before their answers were complete. In this specification counsel for the other appellants expressly refused to join. A reading of the entire record satisfies us that the case was fairly tried, and that the trial judge did not exceed the proper bounds either in seeking to elicit the facts or in maintaining the orderly procedure of the trial. It apparently cannot be repeated too often for the guidance of a part of the legal profession that a judge is not a mere umpire presiding over a contest of wits between professional opponents, but a judicial officer entrusted with the grave task of determining where justice lies under the law and the facts between the parties who have sought the protection of our courts. Within reasonable limits, it is not only the right but the duty of a trial judge, to clearly bring out the facts so that the important functions of his office may be fairly and justly performed. [Citing cases.] For the same reason the trial judge is not to be unduly or unreasonably hampered in his control and conduct of the trial. (*Commercial U. A. Co.* v. *Pacific G. & E. Co.*, 220 Cal. 515, 525 [31 P.2d 793].)"

As to the luncheon incident, the finding of Judge Moncur was that there was no prejudice or bias on the part of the trial judge, and there is nothing in the record that would justify us in holding that such finding is unsupported. However, we are constrained to state that we believe it would be better to entirely abstain from such functions. The entertainment of jurors by parties litigant or by counsel is not to be commended. It is only natural that a litigant who has lost a case would view such a luncheon as was here given with displeasure and suspicion, with the result that motions to disqualify and possible appeals would result. Counsel and court should at all times be solicitous to preserve not only the substance of justice but every appearance of propriety.

Appellant next contends that three improper instructions were given to the jury. Neither the instructions complained of nor any of the instructions given or refused are a part of the record on appeal and we would be justified in ignoring this contention of appellant, for as stated in *Leenders* v. *California Hawaiian etc. Corp.*, 59 Cal.App.2d 752, at page 759 [139 P.2d 987]:

"Defendant is in no position to urge error in any of the instructions given by the court. The burden is on an appellant to present a record on appeal which will support his claims of error. Defendant has presented a transcript which fails to show at whose request any of the instructions were given and it must be presumed in support of the judgment that the instructions complained of were given at defendant's request. (2 Cal.Jur 870.)"

However, we have examined and analyzed the instructions complained of and are convinced that as applied to the evidence in the instant case they were neither erroneous nor prejudicial.

Appellant's final contention is that the court erred in denying his motion to retax costs. On October 19, 1950, the jury rendered a verdict in favor of contestants. On October 23, 1950, copies of the memoranda of costs of contestant Athens Masonic Lodge and contestant Shriners Hospital for Crippled Children were personally served upon the attorneys for appellant, and on that date originals thereof were filed with the county clerk. Thereafter, on November 3, 1950, the judgment in this action was entered and notice of entry of judgment was sent to counsel for all of the parties to the action, and on that same date, the same two contestants filed new cost bills and on November 6th contestant Independent Order of Odd Fellows' Children's Home served and filed a memorandum of costs upon appellant.

Appellant argues that the memoranda of costs of Athens Masonic Lodge and Shriners Hospital for Crippled Children served upon appellant on October 23d were defective because those two contestants did not serve these memoranda on all of the nominal proponents of the will. Secondly, appellant argues that the service of new cost bills by all of the contestants within five days after the entry of judgment was ineffective because such memoranda should have been filed within five days after the verdict.

It is contended by appellant that under Code of Civil Procedure section 1033, in all actions where the case is tried

before a jury, the memorandum of costs must be served within five days after the verdict upon all parties to the contest.

The cost bills of contestants were served upon appellant Leeper who was the proponent of the contested will. Contestants were seeking no judgment for costs against anyone else and it was not necessary, therefore, to serve a copy of the cost bill upon any or all of the other legatees or devisees under the contested will as they did not participate in the trial of the contest. In *Hubbard* v. *Jurian,* 47 Cal.App. 543 [190 P. 1052], the plaintiff contended that the trial court erred in refusing to strike a cost bill where two of the defendants did not serve the cost bill on another defendant as well as on the plaintiff. The court said at page 548:

". . . The appellants filing the cost bill did not ask for judgment against their coappellant. We must hold, therefore, that those appellants were not adverse parties to each other; that it was not necessary that the cost bill be served on the Maryland Casualty Company; and that the trial court properly refused to strike it out on that ground." (Petition for hearing in the Supreme Court denied.)

We do not agree with appellant's contention that the cost bill must be served and filed within five days after the verdict of the jury in a will contest. Section 373 of the Probate Code provides that the jury must return a special verdict upon the issues submitted to them by the court and the court must render judgment either admitting the will to probate or rejecting it. We believe that the provision in section 1033, Code of Civil Procedure, that a memorandum of costs must be served not later than five days after the verdict does not apply to a will contest where only special issues are submitted to a jury and the judgment must be rendered by the court, but applies only to a case where there is a general verdict. In *Whiting* v. *Squeglia,* 70 Cal.App. 108, the court said at page 116 [232 P. 986]:

"On the return of the verdict by the jury on the special issues which had been submitted to it, on motion made by defendant for a judgment on the verdict, the final decision of the case was held in abeyance by the court. No formal stay order as such was ever entered as to the judgment which might be applicable to the verdict of the jury on the special issues. Thereafter the court filed its findings of fact in which the several answers to the special issues theretofore made by the jury were adopted by the court as its own findings, to which other findings by the court were added, and it was

upon such combined findings that the judgment was ordered. The judgment was not entirely based upon the verdict by the jury, but was founded upon the ultimate findings and the conclusions of law thereon by the court. No complaint is made that defendant's cost bill was not served and filed within five days after 'notice of the decision of the court'; and assuming a compliance with such provision of the statute, it must be held that plaintiffs' objection to the filing of defendant's cost bill is not sustainable."

See, also, *Estate of Marcus,* 16 Cal.App.2d 183 [60 P.2d 469]; *Bedolla* v. *Williams,* 15 Cal.App. 738 [115 P. 747].

We therefore hold that a cost bill filed within five days after the entry of a judgment denying admission of a will to probate or admitting a will to probate where a will contest has been tried before a jury is within time.

In view of the foregoing the judgment and orders appealed from are affirmed.

Peek, J., and Van Dyke, J., concurred.