Filed 10/7/24  Estate of Fox CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| Estate of GERALD C. FOX, Deceased.<br><br>GERALD C. FOX FOUNDATION,<br><br>    Petitioner and Respondent,<br><br>v.<br><br>RICHARD B. FOX,<br><br>    Objector and Appellant. | H051471<br>(Santa Clara County<br> Super. Ct. No. 20PR187714) |

Richard B. Fox appeals from a judgment in favor of the Gerald C. Fox Foundation (Foundation) on its amended petition to probate a lost will of the decedent, Gerald "Jerry" C. Fox.  The will provides specific monetary bequests to seven individuals, gives certain stock and partnership interests to two other people, and leaves the remainder of the estate to the Foundation.  On appeal, we address whether the Foundation has standing to probate the will as an " 'interested person' " within the meaning of Probate Code section 48, subdivision (a).[1]  We also decide whether substantial evidence in the record supports the trial court's finding that the will was duly executed.

---

[1] All further unspecified references are to the Probate Code.

For the reasons stated below, we answer both questions in the affirmative and affirm the judgment admitting the will to probate.

## I. FACTS AND PROCEDURAL BACKGROUND[2]

*A. Fox Family and Foundation Background*

Dr. Richard B. Fox and David K. Fox are brothers of the late Gerald C. Fox ("Jerry").[3] The brothers were raised in Minnesota after the family settled there in 1952. The brothers' father, Bill C. "B.C." Fox founded an industrial distribution business called the Lakeland Companies. The Lakeland Companies prospered and branched into several subdivisions.

Jerry had developmental challenges (described at times by the parties as "reduced mental capacity") throughout his life. After graduating from high school in the late 1960s, Jerry worked in the warehouse of one of his father's Lakeland companies. Between 1985 and 1987, B.C. transferred shares of stock in various Lakeland companies to his personal attorney, John Tambornino, to be held in trust for Jerry. B.C. instructed Tambornino to pay earnings from the shares back to the Lakeland Companies, which Tambornino did over many years.

Jerry owned his home and lived independently until 1995, when he suffered a broken hip. Following his hip injury, Jerry moved to an assisted living facility in Minnesota. Richard, who had become a physician and moved to California in 1989, visited Jerry several times between 2005 and 2010. He found Jerry wheelchair-bound

---

[2] This appeal is one of several actions that have been filed concerning the trust and estate of Gerald "Jerry" C. Fox, his foundation, and financial wrongdoing perpetrated against Jerry during his lifetime. We address requests for judicial notice of court filings related to those proceedings where relevant to provide context for the arguments raised in this appeal. (See fn. 5, *post*.) The facts set out here are drawn from the trial court's final written statement of decision, the trial testimony, and the record on appeal. We recite the facts in the manner most favorable to the judgment, resolving conflicts and drawing inferences in favor of the Foundation. (See *Nwosu v. Uba* (2004) 122 Cal.App.4th 1229, 1233, fn. 2.)

[3] For clarity, we generally refer to Fox family members by their first names.

and in poor health. In 2011, Richard made arrangements to move Jerry to California so he could oversee Jerry's care. Richard and his wife cared for Jerry until Jerry's death in 2017.

In 1999, Jerry established the Foundation, a Minnesota nonprofit corporation. Jerry intended the Foundation to be his legacy and to support a number of organizations, including one that had helped him recuperate from surgeries stemming from his hip injury. The Foundation's bylaws direct that it make distributions to specified Minnesota-based charities. The initial directors of the Foundation included Jerry, Jerry's father B.C., Jerry's brother David, and Jay Johnson, who also served as an accountant and chief financial officer for the Lakeland Companies.

In August 2011, before Richard moved Jerry to California and assumed his care, B.C. established the Intervivos Trust of Gerald C. Fox (the trust) for Jerry and asked Richard to serve as trustee. B.C. told Richard that he (B.C.) would handle the financial aspects of the trust and that Richard should let B.C. know how much money he needed for Jerry's care. Richard, Jerry, and B.C. met with attorney Tambornino to execute the trust agreement. Richard served as trustee of the trust from August 2011 until October 2019, when he resigned the trusteeship. The trust contained assets worth millions of dollars.

B.C. Fox died in March 2017. Jerry died in October 2017. Shortly before Jerry's death, Richard drafted a second amendment to the trust (second amendment). Richard visited Jerry in the hospital's intensive care unit and had him sign the second amendment, giving rise to the trust litigation discussed herein (pt. I.B., *post*). After Jerry died, Richard began reviewing Jerry's accounts in his capacity as trustee and discovered that Johnson had been writing checks to himself from Jerry's trust account. Richard initiated legal proceedings, discussed below (pt. I.B., *post*), against Johnson and others.

In 2018, the Foundation's directors removed Johnson from the board for misappropriation of Jerry's assets. David's spouse, and later his children, Allison Greene

3

and Charles Fox, were appointed to the Foundation's board. In 2020, one week after the trial court entered judgment in the trust litigation, the Foundation filed a verified petition for probate, initiating the present action. The probate court appointed Bank of the West as special administrator for the estate.

### B. Trust Litigation and Related Lawsuits

The trust, established in 2011, was amended in 2013 to incorporate additional assets. The trust agreement provided that upon Jerry's death, the trustee would distribute certain capital stock and limited partnership interest equally to Jerry's niece and nephew, Allison and Charles, and would then distribute the remaining assets, including the trust principal, to the Foundation.

After Jerry's death, the Foundation learned of the second amendment, which added language distributing the trust balance (after specific bequests to Allison and Charles) to Richard and his son (45 and 5 percent, respectively) and the Foundation (50 percent), rather than distributing the entire balance to the Foundation. This alteration allegedly decreased the assets to be distributed to the Foundation by over $7 million.

Allison, Charles, and the Foundation sued Richard in 2018 (hereafter, the trust litigation) seeking to invalidate the second amendment, remove Richard as trustee, find him liable for financial elder abuse (Welf. & Inst. Code, § 15610.30), and impose compensatory and punitive damages against him. After initially defending the validity of the second amendment, Richard conceded before trial that the second amendment was invalid and subject to recission. Richard nevertheless sought to invalidate the trust entirely, arguing it was void from inception due to Jerry's lack of capacity to execute the trust when it was established in 2011.

After a 2019 bench trial, the trial court in the trust litigation found against Richard and rejected his contention that the trust was invalid. The court entered an amended judgment declaring the second amendment to the trust void and awarding costs and attorney fees to the Foundation, Allison, and Charles. Richard removed himself as

4

trustee and appealed. That appeal was pending at the time of trial in the present probate matter but has since been decided. In an unpublished opinion, the appellate court in the trust litigation affirmed the judgment against Richard. (*Gerald C. Fox Foundation, et al. v. Richard B. Fox* (Mar. 6, 2023, A165821) (hereafter, *Fox Foundation*).)[4]

Prior to trial in the trust litigation, Richard as trustee filed a verified petition in Santa Clara County Superior Court against Jay Johnson in relation to Johnson's alleged embezzlement of trust funds. In June 2019, the probate court entered a default judgment against Johnson, finding him liable for conversion of $846,000, breach of fiduciary duty, and elder financial abuse. The probate court ordered payment of prejudgment interest and double damages totaling $2,392,608. (*In re: Gerald C. Fox Trust*, Super. Ct. Santa Clara County, No. 18PR182796, filed June 25, 2019.)

In 2020, Richard filed a separate action against various Lakeland Companies (including Lakeland Management Services), David (in his capacity as chief executive

---

[4] Richard has requested that this court take judicial notice of the opinion in *Fox Foundation*. Judicial notice of the appellate opinion, which was pending and referenced by the trial court and parties in the probate action, is proper pursuant to Evidence Code section 452, subdivision (d) and is relevant for the purpose of confirming the finality of the judgment in that case and the result reached. (See *Kilroy v. State of California* (2004) 119 Cal.App.4th 140, 148; accord *Gilmore v. Superior Court* (1991) 230 Cal.App.3d 416, 418.)

Richard additionally requests judicial notice of petitions and orders in related proceedings. The Foundation does not oppose these requests but argues that notice of these proceedings is not necessary to resolve this appeal.

We grant the request for judicial notice of the following court filings: Richard's first amended verified petition alleging elder financial abuse, embezzlement, and other claims against the Lakeland Companies, David, and Jay Johnson (*Richard Fox v. Lakeland Management Services et al.* (Super. Ct. Santa Clara County, No. 20PR187714, filed Sept. 12, 2022); the February 10, 2023 stipulated order to stay proceedings in Richard's elder financial abuse and embezzlement case pending final resolution of the instant probate matter; and the September 25, 2019 order of default judgment on the May 29, 2018 verified petition by the trust against Jay Johnson (*In re: Gerald C. Fox Trust*, Super. Ct. Santa Clara County, No. 18PR182796, filed June 25, 2019).

We deny Richard's remaining requests for judicial notice (requests for judicial notice Nos. 4, 6, 7, 8, and 9) as irrelevant to resolution of this appeal.

officer of Lakeland Management Services), and Johnson (formerly chief financial officer of Lakeland Management Services).  (*Richard Fox v. Lakeland Management Services et al.*, Super. Ct. Santa Clara County, No. 20PR187714, filed Sept. 12, 2022.)  On February 10, 2023, the trial court filed a stipulated order staying the *Lakeland Management Services* case pending final resolution of the probate matter at issue here.  That case remains stayed.

### *C. Estate Litigation and Probate of the 2001 Lost Will*

The Foundation filed the initial verified petition for probate of lost will and for letters of administration in the present matter in February 2020, shortly after entry of the trial court's judgment in the trust litigation.  The initial petition sought to admit a will dated August 23, 2011 (2011 will).  The Foundation estimated the "character and estimated value of the property of the estate" on the Judicial Council probate form (DE-111) as $11,000.  (Boldface omitted.)  Richard filed a verified objection and will contest, alleging that the 2011 will was not a signed will but merely a conformed copy of a will from attorney Tambornino's files.

The Foundation replied by filing a verified response and amended petition for probate of lost will and for letters of administration (hereafter, petition).  The petition proffered alternative wills, in the event the probate court were to deem the 2011 will ineffective.  This included a conformed copy of a will dated October 9, 2007 (2007 will) and a copy of a will dated May 10, 2001 (2001 will).  The petition alleged that, after overseeing the execution of the 2011 will, Tambornino made a conformed copy for his file and provided the original will to B.C. for safekeeping.  After B.C.'s death in March 2017 and despite "[a]ll reasonable efforts to locate the original" of the 2011 will, it had not been located.  The petition alleged similar facts as to the 2007 will.  As to the 2001 will, the petition alleged that Tambornino believed that he had given the original 2001

6

will to B.C. in accordance with Tambornino's standard practice. The petition asserted that the 2001 will is "self-proving" pursuant to section 8220.[5]

Richard moved for summary adjudication of the wills. He argued that the 2011 and 2007 wills were void because they lacked the signatures of the testator or of any purported witness, and the 2001 will was last known to be in possession of the testator and therefore is "presumed revoked" under section 6124.

The trial court denied summary adjudication and ruled there was a triable issue of fact as to whether the 2011 and 2007 wills were duly executed. Regarding the 2001 will, the court deemed the presumption of revocation argument "without merit" because there was no evidence that the testator (Jerry) was the last person to possess the 2001 will. The only relevant evidence on that point was Tambornino's testimony that Tambornino's standard practice was to provide the original estate documents to B.C.

At trial on the probate petition, the Foundation sought to admit only the 2001 will to probate. The 2001 will provides specific $25,000 bequests to seven individuals. It gives all of Jerry's stock and partnership interests in three closely held entities to Allison and Charles. It gives "all the remainder of [the] estate wherever situated" to the Foundation. Richard is not a beneficiary under the terms of the 2001 will.

Immediately prior to trial, Richard filed a motion challenging the Foundation's standing to bring the petition to probate Jerry's 2001 will. The motion asserted that the Foundation lacked standing as a residual beneficiary under the 2001 will because, by the Foundation's own admission, the assets of the estate (estimated in the petition as $11,000) were insufficient to satisfy the bequests in the will and leave any residual estate to the Foundation. Richard argued that without a residual estate, the Foundation had no

---

[5] Unless there is a will contest, section 8220 allows several methods of proof of execution of a will, including based on "(a) . . . the evidence of one of the subscribing witnesses only, if the evidence shows that the will was executed in all particulars as prescribed by law," and "(b) . . . an affidavit of a subscribing witness to which there is attached a photographic copy of the will." (§ 8220, subds. (a), (b).)

property right or interest in the proceeding and therefore could not qualify as an " 'interested person' " under section 48 for purposes of standing to probate a will.

The trial court made a tentative ruling denying Richard's claim that the Foundation lacked standing and proceeded with a bench trial on the 2001 will. The court later received supplemental briefs from the parties and heard additional argument on standing. Richard maintained that any interest of the Foundation was "hypothetical and speculative" based on the outcome of the appeal in the trust litigation and did not qualify as a property interest or claim that may be affected by the probate proceeding.[6] The Foundation countered that several of the related lawsuits filed by Richard claim assets that they contend should be in the estate, not the trust. Bank of the West, as special administrator of the estate, argued it was "common sense" that the Foundation has standing because the financial elder abuse claim filed by Richard in the *Lakeland Management Services* case is an asset of the estate, regardless of how the claim resolves, and because the Foundation is a vested beneficiary under the will—whether the beneficial interest amounts to "zero or . . . a trillion dollars."

After considering these arguments and the statutory definition of " 'interested party' " under section 48, subdivision (a)(1), the trial court found that the Foundation has standing. The court rejected Richard's position that the Foundation was bound to its statement in the petition estimating the value of the estate assets to be $11,000. The court explained that a position taken in the pleading stage of litigation does not preclude other information coming to light during the proceedings and does not have a binding effect on the jurisdictional question of standing.

Both sides presented testimony and evidence on the execution of the 2001 will and its contested validity, the credibility of key witnesses including attorney Tambornino (whose deposition testimony was admitted without objection), whether certain assets

---

[6] Richard acknowledged that if he were successful in his then-pending appeal in the trust litigation, the trust would be voided and the trust assets would flow to the estate.

(such as those placed in Tambornino's name in trust for Jerry) were part of the estate, and expert testimony regarding methods and standards to assess whether a non-original (scanned or photocopied) document has been manipulated.

After closing arguments, the trial court issued an oral tentative decision granting the petition to admit the 2001 will to probate. It found that the 2001 will was a true and authentic copy of the lost will which had been duly executed by Jerry. The court noted that it had carefully reviewed Tambornino's complete file (which it had admitted into evidence at trial) and that the file contents reflected Tambornino's longstanding representation of Jerry and appeared to be in good order with no apparent irregularity. The court found that of the two copies of the 2001 will from Tambornino's file (exhibits 100 and 101), the evidence supports the Foundation's theory that exhibit 101 is an original copy of the 2001 will and exhibit 100 is "some kind of scan or some kind of duplication from that original copy." The court rejected Richard's argument and expert testimony suggesting manipulation of the documents as unsupported by the evidence or by any plausible theory of fraud. The court found that Tambornino's deposition testimony was credible, as was the testimony of Michelle Hudinski confirming her signature as a witness to Jerry's signing of the 2001 will. The court stated that the Foundation had met its burden under both a preponderance and clear and convincing evidence standard and that the 2001 will could be admitted to probate.

The trial court issued a written statement of decision pursuant to a request by Richard and after considering his written objections. The trial court reiterated its findings on standing based on the statutory language and the facts presented. It reasoned that even if Richard were unsuccessful in overturning the judgment in the trust litigation, other factors could affect the value of the estate assets, including the possibility that some or all of the specific bequests under the 2001 will may not be fulfilled, or that after-discovered assets may emerge. The statement of decision further explained the trial court's findings regarding the authenticity of the copies of the 2001 will, the absence of evidence to

9

support Richard's claim of fraud, Tambornino's credibility, and the evidence supporting a finding of due execution.

Richard filed a motion for new trial, which the trial court denied. Richard appeals from the judgment.

## II. DISCUSSION

Richard contends that the Foundation lacks standing as an interested party to pursue the probate petition. He also asserts that the trial court failed to apply the stringent standard of proof applicable to ascertaining due execution of a lost will. As to this latter point, we understand Richard to challenge the sufficiency of the evidence to support the trial court's factual finding that the copy of the 2001 will was authentic.

*A. Standing*

Richard's standing arguments center on what he argues are insufficient assets in the estate to support the Foundation's interest as a residual beneficiary. He asserts that to have standing in a probate proceeding, a party must have " 'a property right in or claim against' " the estate within the meaning of section 48. He contends that the Foundation failed to introduce evidence to support its claim and is bound by its pleading and discovery responses estimating, respectively, the estate assets to be $11,000 or " 'minimal.' " Richard maintains that a potential, future, or speculative interest in the residual estate is insufficient to confer standing on the Foundation.

We conclude that these arguments are unpersuasive given the Probate Code's statutory definition of an " 'interested person,' " the discretion afforded the trial courts in determining who is an interested person within the meaning of the statute, and the evidence adduced at trial.

1. Legal Principles and Standard of Review

Section 8000 authorizes "any interested person" to "commence proceedings for administration of" a decedent's estate by a petition to the court for probate of the decedent's will. (*Id*., subd. (a)(2).) This authorization includes a petition to probate a

10

lost will. (*Id*., subd. (b).) Section 48 governs who is an " 'interested person' " who may participate in probate proceedings. (*Id*., subd. (a).) It states that an " 'interested person' includes any of the following: [¶] (1) [a]n heir, devisee, child, spouse, creditor, beneficiary, and any other person having a property right in or claim against a trust estate or the estate of a decedent which may be affected by the proceeding." (*Id*., subd. (a)(1).) Further, "[t]he meaning of 'interested person' as it relates to particular persons may vary from time to time and shall be determined according to the particular purposes of, and matter involved in, any proceeding." (*Id*., subd. (b).)

The statutes allow the probate court "flexibility in determining whether to permit a party to participate as an interested party." (*Estate of Sobol* (2014) 225 Cal.App.4th 771, 782 (*Estate of Sobol*); see also *Estate of Prindle* (2009) 173 Cal.App.4th 119, 126 (*Estate of Prindle*).) Our Supreme Court has explained that the interested party provision is intended to ensure that all persons who may be affected and bound by the various orders and decrees entered through the course of the administration of an estate "might appear and protect their rights in the proceedings that lead to such orders and decrees." (*In re Loring's Estate* (1946) 29 Cal.2d 423, 428 (*Loring's Estate*).) There is, accordingly, widespread agreement that section 48, subdivision (a) "does not purport to provide an exclusive list of recognizable interests" but "[r]ather, [] permits the court to designate as an interested person anyone having an interest in an estate which may be affected by a probate proceeding." (*Estate of Davis* (1990) 219 Cal.App.3d 663, 668 (*Estate of Davis*).) Further, "[s]ubdivision (b) allows the court to determine the sufficiency of that party's interest for the purposes of each proceeding conducted." (*Ibid*.)

We review the probate court's exercise of discretion in deciding whether a party is an interested person pursuant to section 48 under the deferential abuse of discretion

11

standard.[7]  (*Estate of Prindle*, *supra*, 173 Cal.App.4th at p. 126; *Estate of Sobol*, *supra*, 225 Cal.App.4th at p. 782.)

    2.  Analysis

Applying these principles to the facts of this case, we conclude the trial court did not abuse its discretion in deciding the Foundation has standing to petition for probate of the 2001 will.  In the 2001 will, Jerry (1) authorized his personal representative to pay funeral expenses and settle all claims asserted against the estate, (2) gave $25,000 to each of seven named individuals, (3) divided equally his capital stock and limited partnership interest in three closely held entities between Allison and Charles, and (4) "g[a]ve, devise[d], and bequeath[ed] all the remainder of [Jerry's] estate wherever situated to the . . . Foundation."

Under the terms of the will, the Foundation is a "beneficiary" of the estate (§ 48, subd. (a)(1)) in the amount of its residue, if any.  The Foundation is also a "person having a property right in . . . the estate of a decedent which *may* be affected by the proceeding." (*Ibid*., italics added.)  The phrase "may be affected" (§ 48, subd. (a)(1)) is permissive (§ 12) and should be interpreted in a manner consistent with the legislative intent to afford "all persons 'interested in the estate' whose rights may be affected" by estate proceedings standing to appear and protect their rights.  (*Loring's Estate*, *supra*, 29 Cal.2d at p. 428.)  In addition, the trial court may consider "the particular purposes of,

_____

[7] Having failed to address the applicable standard of review in his appellant's opening brief, Richard argues in his reply brief that this court's review of the probate court's interpretation of the statute and related legal rulings is de novo.  However, Richard does not explain why the standard of review in this case would differ from the abuse of discretion standard of review applied in the published decisions cited *ante*.  In any event, the abuse of discretion standard calls for varying levels of deference depending on the aspect of the trial court's ruling under review.  (*Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 711–712.)  We review the trial court's legal conclusions de novo and its factual conclusions for substantial evidence.  (*Ibid*.)  As to the trial court's application of the law to the facts, we may reverse only if we find that the court acted in an arbitrary and capricious manner.  (*Id*. at p. 712.)

and matter involved in, any proceeding" (§ 48, subd. (b)), allowing it to look at and consider the context for the probate petition. (*Estate of Davis*, *supra*, 219 Cal.App.3d at p. 668.) Here, that context necessarily includes the other pending actions involving the trust and estate and the conflict between the Foundation's interest in probate of the will and Richard's interest in maintaining his standing as an intestate heir.

Richard asserts that despite being named the residual beneficiary under the 2001 will, the Foundation is not an interested party under section 48 because, according to the Foundation's own pleaded facts and admission in discovery, the seven specific bequests exceed the assets of the estate. Richard points out that under the 2001 will, the seven individual gifts, totaling $175,000, along with funeral expenses and any debts of the estate, far exceed the Foundation's estimate of $11,000 in estate assets. He makes the same argument with respect to the Foundation's verified response to request for admissions, in which the Foundation admitted that the value of accounts held by Jerry at the time of his death "were minimal." Richard cites *Valerio v. Andrew Youngquist Construction* (2002) 103 Cal.App.4th 1264 (*Valerio*) for the proposition that the Foundation is bound by the estimate of $11,000 or " 'minimal' " assets in the estate as stated in its verified pleading and discovery responses. He argues that since the Foundation presented no evidence at trial that the bequests have been adeemed or that the individual devisees are unable to take or would refuse the bequests, there are no residual assets in the estate—leaving the Foundation without standing to probate the will.

We disagree that the Foundation's estimate of $11,000 or " 'minimal' " assets in the estate is determinative. First, the Foundation's estimate in its verified petition of the "character and estimated value of the property of the estate" cannot reasonably be construed as a judicial admission. As stated in *Valerio*, a judicial admission operates as " 'a *waiver of proof* of a fact by conceding its truth, and it has the effect of removing the matter from the issues.' " (*Valerio*, *supra*, 103 Cal.App.4th at p. 1271.) However, "not every factual allegation in a complaint automatically constitutes a judicial admission.

13

Otherwise, a plaintiff would conclusively establish the facts of the case by merely alleging them, and there would never be any disputed facts to be tried." (*Barsegian v. Kessler & Kessler* (2013) 215 Cal.App.4th 446, 452 (*Barsegian*).) As explained in *Barsegian*, "a judicial admission is ordinarily a factual allegation by one party that is admitted by the opposing party. The factual allegation is removed from the issues in the litigation because the parties agree as to its truth. Thus, facts to which adverse parties stipulate are judicially admitted. [Citation.] Similarly, in discovery when a party propounds requests for admission, any facts admitted by the responding party constitute judicial admissions. [Citations.] And when an answer admits certain factual allegations contained in a complaint or cross-complaint, those facts are likewise judicially admitted." (*Ibid*., italics omitted.)

The petition allegation concerning the value of the estate represents an estimate based on the state of assets known to the Foundation when it filed the amended petition. Unlike an admission of factual allegations in response to a discovery request, or in an answer to a complaint or cross-complaint, the value alleged in the verified petition is not agreed upon between the parties and does not constitute a judicial admission. (*Barsegian*, *supra*, 215 Cal.App.4th at p. 452.) Richard's reliance on *Valerio* is unavailing in that the decision in that case concerned the admission of fact in an answer to a cross-complaint, not an allegation in a complaint (or here, a petition) that has yet to be proven by competent evidence. (*Valerio*, *supra*, 103 Cal.App.4th at p. 1271; see also *Dunlap v. Mayer* (2021) 63 Cal.App.5th 419, 426 [rejecting trial court's reliance on verified objections to a contested petition absent "competent evidence establishing the allegations"].) And while the Foundation's discovery responses may be properly construed as binding (*Barsegian*, at p. 452; see Code Civ. Proc., § 2033.410), the admission provided by the Foundation and relied on by Richard offers scant information

14

about the estate's actual value.[8]  The Foundation's admission that " 'minimal' " estate assets were in Jerry's accounts when he died does not account for after-discovered assets or Richard's pending legal claims on behalf of the estate, including (at the time) his pending appeal of the trust litigation and his financial elder abuse claim against the Lakeland Companies, David, and Johnson.

Moreover, we disagree with the premise of Richard's argument that standing to proceed as an interested party to probate the 2001 will depends on whether the Foundation will receive assets thereunder.  As the trial court observed in its ruling on standing, "[t]he Foundation does not have to prove it *will* be affected by the [p]robate [p]roceeding in order to have standing, it must only show its interests *may* be affected by the [p]robate [p]roceeding--even if, at the end of the day, the Foundation ultimately does not receive any assets as a devisee or residual beneficiary."  We agree with this conclusion, which finds support in the statutory language of section 48, discussed *ante*, and in cases affirming a more liberal construction of " 'interested person' " within the meaning of section 48 as "anyone having an interest in an estate which may be affected by a probate proceeding."  (*Estate of Davis*, *supra*, 219 Cal.App.3d at p. 668.)

Thus, in *Estate of Maniscalco* (1992) 9 Cal.App.4th 520, a prospective bidder on estate property had standing to intervene in the probate proceeding after giving notice of its intent to bid, despite having no preexisting relationship with the estate or to the property.  (*Id*. at pp. 522–524.)  In *Estate of Prindle*, *supra*, 173 Cal.App.4th at page 127, an insurer had standing to petition for the removal of the estate administrator, where the outcome of the probate proceeding "*could* affect" the insurer financially.  (Italics added.) And in *Estate of Davis*, *supra*, 219 Cal.App.3d at page 669, a probate administrator's surety had standing to participate in a distribution proceeding based on there being a

---

[8] In response to Richard's request for admission regarding the total value of the estate, the Foundation responded in pertinent part that "the value of accounts held by Gerald C. Fox at the time of his death were minimal."

potential financial impact on the surety if the administrator were held liable. By contrast, in *Estate of Sobol*, *supra*, 225 Cal.App.4th at pages 783–784, the objector, formerly named as the executor in the decedent's will, did not have standing to challenge the codicil to the will appointing different co-executors, since an executor has no beneficial or pecuniary interest in the estate and no interest in a representative capacity where the codicil otherwise made no changes to the disposition of assets.

*In re Plaut's Estate* (1945) 27 Cal.2d 424 (*Plaut's Estate*), cited by the trial court in its statement of decision, is instructive. There, the testator's granddaughter challenged a codicil to the will which gave $15,000 to the decedent's nurse. (*Id*. at p. 425.) The will itself created a testamentary trust for the testator's daughter during her lifetime and left any trust remainder to his granddaughter and grandson. (*Id*. at p. 426.) The granddaughter claimed that the codicil impaired her interest as a residuary legatee. (*Ibid*.) The probate court sustained the respondent (nurse)'s demurrer to the petition on the ground that the granddaughter was not an interested person within the meaning of Probate Code former section 380 (which at the time governed postprobate will contests). (*Id*. at p. 425.)

The California Supreme Court reversed and held it sufficient that the granddaughter was "at least a possible beneficiary under a plan of devolution established by the testator himself." (*Plaut's Estate*, *supra*, 27 Cal.2d at p. 430.) The court reasoned that the right to adjudicate a claim to the estate "should not be denied a person who, even though he may ultimately not receive any part of the estate, has at least established a prima facie interest in that estate." (*Id*. at p. 428.) Further, "[t]he requirement that the contestant be an interested person prevents persons with no interest from delaying the settlement of the estate, but does not compel a person who has established that his interest 'may be impaired' [citation], to prove that it will in fact be impaired." (*Id*. at p. 429.) The court distinguished the granddaughter's interest as a remainderman, which the court deemed sufficient to contest the codicil, with cases involving more remote interests, like

16

the heirs of a person who is entitled to contest the will, or the state whose interest is based on the possibility that the decedent's heirs do not take under the will and the property escheats. (*Id.* at p. 430.) The court concluded that while the granddaughter "may never take any part of [the testator's] estate, any part that she takes as a remainderman will come to her by the testator's will, not by succession to a beneficiary under that will. She should, therefore, be allowed to contest any testamentary disposition of the testator likely to impair her legacy." (*Ibid.*)

The reasoning of our high court in *Plaut's Estate* applies equally here. Although the Foundation "may never take any part of [the] estate, any part that [the Foundation] takes" as residual beneficiary comes to it by the 2001 will. (*Plaut's Estate*, *supra*, 27 Cal.2d at p. 430.) The possibility that there might be nothing left to recover does not divest the Foundation of standing to probate the will. As in *Plaut's Estate*, we conclude it is enough that the 2001 will creates a residual interest in the estate, and that interest may be impacted by the admission of the will to probate. (*Ibid.*; § 48, subd. (a).)

Richard implicitly concedes the applicability of *Plaut's Estate* but maintains that the Foundation cannot make out even a prima facie interest under its authority. He contends that any analysis of the Foundation's interest "must take note of the fact that, as a beneficiary of the will at issue, the Foundation's interest is *only* in the [t]estate [e]state." Richard asserts that any potential for additional assets resulting from his financial elder abuse and other claims requires that he have standing as an intestate heir to pursue those claims, and that his standing and any recovery would be nullified by the admission of the 2001 will to probate. He similarly points out, given the appellate court's affirmance of the judgment in *Fox Foundation*, that there is no possibility that the estate will receive assets based on the invalidation of the trust. Richard compares these circumstances to those in *Lickter v. Lickter* (2010) 189 Cal.App.4th 712 (*Lickter*) and *Tepper v. Wilkins* (2017) 10 Cal.App.5th 1198 (*Tepper*).

17

These decisions do not assist Richard. In *Lickter*, the Court of Appeal affirmed the trial court's summary judgment order on the ground that plaintiffs in an elder abuse action on behalf of their deceased grandmother did not have standing to pursue their claim. (*Lickter*, *supra*, 189 Cal.App.4th at pp. 717, 725.) The plaintiffs were beneficiaries under their grandmother's trust and during probate proceedings received the distributions to which they were entitled. (*Id*. at p. 720.) However, with respect to the elder abuse action, the appellate court held that although the plaintiffs were beneficiaries of the trust, they were not " 'interested persons' " within the meaning of section 48 (as referenced in the relevant statutory provision governing elder abuse claims). (*Id*. at p. 724.) The court explained that under section 48, a " 'beneficiary' must have 'a property right in or claim against a trust estate or the estate of a decedent which may be affected by the proceeding' in order to be an 'interested person' with respect to that proceeding." (*Id*. at p. 728.) It reasoned that the plaintiffs' "beneficial interest . . . in the trust estate was not one that could have been 'affected by' " the elder abuse action. (*Id*. at p. 729.) In short, the elder abuse proceeding was independent and unrelated to the plaintiffs' status as beneficiaries of the trust. Here, by contrast, the admission of the 2001 will has a direct effect on the Foundation's interest in the estate, which is created by the 2001 will and validated by its admission to probate. The fact that *Fox Foundation* eliminated any possibility of the trust assets becoming estate assets does not alter the nature of the Foundation's interest in confirming its right to the residual estate by probate of the 2011 will.

*Tepper* is also inapposite. *Tepper* arose from a daughter's elder abuse action against her three siblings who served as trustees of their 88-year-old mother's revocable living trust. (*Tepper*, *supra*, 10 Cal.App.5th at p. 1201.) The trial court sustained the siblings' demurrer without leave to amend after concluding that the plaintiff lacked standing. (*Ibid*.) The appellate court affirmed. (*Id*. at p. 1209.) It rejected the plaintiff's contention that she had standing as an " 'interested person' " to prosecute the action on

18

her mother's behalf. (*Id*. at p. 1206.) Setting aside what the appellate court called "a serious question" about whether section 48's definition of " 'interested person' " "is properly invoked in a proceeding when the elder is still alive" (*ibid*.), the court noted that the plaintiff did not claim to have any legally cognizable interest in her mother's revocable living trust. (*Ibid*.) Furthermore, it reasoned that even if she were named a beneficiary, she would still not have an interest for standing purposes because a beneficiary's interest in a revocable living trust is " ' "merely potential" ' " and may be revoked at any time. (*Ibid*.)

As established *ante*, the Foundation's beneficial interest—though limited to the residual estate, if any—is neither potential nor speculative. It is a vested interest under the 2001 will, giving the Foundation a "property right in . . . the estate of a decedent which may be affected by" probate of the 2001 will. (§ 48, subd. (a)(1).) Even assuming, for purposes of this analysis, that the Foundation is bound by its admission that there are " 'minimal' " assets available in the estate and that after-discovered assets related to pending litigation would not be available to the testate estate, those facts do not alter our conclusion that the Foundation's interest as a residual beneficiary under the 2001 will at issue in the probate matter is sufficient to establish standing. Under these circumstances, Richard has not shown an abuse of discretion in the trial court's assessment of the evidence or application of the law. (*Estate of Prindle*, *supra*, 173 Cal.App.4th at p. 126.)

### B. *Proof of Due Execution*

Richard contends that the trial court erroneously admitted the 2001 will to probate despite failing to apply the " 'stringent requirements for proof of lost or destroyed wills' " standard articulated in *Lauermann v. Superior Court* (2005) 127 Cal.App.4th 1327, 1331 (*Lauermann*), quoting *In re Janes' Estate* (1941) 18 Cal.2d 512, 518 (*Janes' Estate*). We disagree.

The Probate Code vests the trial court with factfinding authority to "try and determine any contested issue of fact that affects the validity of the will." (§ 8252, subd. (b).) The proponent of the will carries the burden of proof of due execution at trial, while the will contestant has the burden of proof to show lack of testamentary intent or other negating factors such as fraud or undue influence. (*Id.*, subd. (a).) "The question of due execution of a will is one of fact, and the probate court's finding will not be reversed on appeal if there is any substantial evidence to sustain it." (*Estate of Ben-Ali* (2013) 216 Cal.App.4th 1026, 1033; *Estate of Fletcher* (1958) 50 Cal.2d 317, 320.) In reviewing the trial court's findings for substantial evidence, we consider all the evidence in the light most favorable to the prevailing party, defer to the trial court's credibility determinations, and liberally construe the court's findings of fact to support the judgment. (*Gomez v. Smith* (2020) 54 Cal.App.5th 1016, 1026; *In re Weber's Estate* (1952) 113 Cal.App.2d 160, 165 (*Weber's Estate*).)

In this case, the trial court made detailed findings on the contents of the Tambornino file, the copies of the 2001 will from the attorney's file and admitted at trial (exhibits 100 and 101), Tambornino's credibility, and the evidence of due execution of the 2001 will. The court found that the Foundation had introduced "ample evidence of the authenticity of the copies of the 2001 will through Tambornino and Hudinski to permit their admission." The court concluded that Richard's objections concerning authenticity and fraud (filed after the exhibits had been admitted without objection at trial) went to the weight of the evidence, not its admissibility. (See *Jazayeri v. Mao* (2009) 174 Cal.App.4th 301, 321.)

The trial court rejected Richard's contention that the copies of the will were fraudulent, noting it had reviewed the contents of the Tambornino file (which had been delivered to the court after inspection by the parties and their experts), found the file in good order and containing appropriate documents considering Tambornino's several decades of representing Jerry, and showed no signs of irregularity. It considered the

20

parties' experts' testimony and observations about the copies, whether original (an original scan) or multigenerational, and the inferences arising from the observable characteristics of the documents, such as their pixilation and the two-hole punches visible at the top of one copy but not the other. Based on its inspection of the documents and other examples throughout the file, the court concluded that Richard had not shown any irregularity that would support his fraud claim. It found that, notwithstanding Richard's contention that photocopies like exhibit 101 are easily fabricated using imaging processing software, Richard had "offered no evidence that manipulation occurred here." The court found that Tambornino had testified credibly about the authenticity of the 2001 will and its execution, as had Hudinski as a witness to the will's signing, and that circumstantial evidence contained in the attorney's file further supported the authenticity finding. The trial court concluded that Richard had not met his burden to demonstrate fraud that would undermine the authenticity of the 2001 will.

As for admitting the 2001 will to probate, the trial court found that the Foundation had met its burden to show due execution under California law. The court credited Tambornino's testimony regarding his preparation of the will, Jerry's execution of the will on May 10, 2001, as witnessed by Tambornino and two witnesses (including Hudinski, whose deposition testimony was admitted at trial), and Tambornino's notarization of the will. The court concluded that the evidence satisfied the statutory requirements for due execution. (§ 6110, subds. (b)(1), (c)(1) [requiring will to be signed by the testator and witnessed by two persons present]; see also *Estate of Ben-Ali*, *supra*, 216 Cal.App.4th at p. 1036 [noting "the rule in California and elsewhere is that proof of the signatures of the decedent and the witnesses makes out a prima facie case of due execution"].)

Having carefully reviewed the record, we conclude that substantial evidence supports the trial court's findings. Richard does not appear to directly challenge the sufficiency of the evidence to support the trial court's findings under section 6110. He

does not summarize the material evidence supporting execution of the 2001 will as is required for substantial evidence challenges on appeal. (*Huong Que, Inc. v. Luu* (2007) 150 Cal.App.4th 400, 409, italics omitted [explaining that a party claiming insufficient evidence on appeal " 'must summarize the evidence on that point, favorable and unfavorable, and show how and why it is insufficient.' "]; *Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881 [appellant must "set forth in their brief *all* the material evidence . . . and *not merely their own evidence*" to support substantial evidence claim on appeal].) Instead, Richard reiterates his challenge to the authenticity of exhibit 101 and asserts that Tambornino's testimony is unreliable and fails to meet the " 'stringent requirements' " standard because Tambornino acted in breach of his fiduciary duty to Jerry and was complicit in the embezzlement of Jerry's trust money.

The contention that exhibit 101 is fraudulent ignores the evidence supporting the trial court's finding that exhibit 101 is an authentic copy of the original will and improperly asks this court to draw contrary inferences from the evidence. Not only did the trial court consider the expert testimony proffered by both sides, including that of the Foundation's expert acknowledging that he is unable to determine the device used to create the exhibit—whether photocopier or scanner—but Richard's assertion on appeal that "[w]e know that [e]xhibit 101 . . . was produced by a laser printer because the characters are pixilated" cites only to his own expert's testimony. The contention that Tambornino was a "conflicted, untrustworthy embezzler" and therefore could not provide credible testimony regarding execution of the 2001 will is similarly based on unproven speculation[9] and does not address any of the supporting evidence underlying the court's credibility determinations.

---

[9] The trial court heard testimony from Richard about Tambornino's alleged conflict of interest between maintaining funds for Jerry's benefit or for the benefit of the Lakeland Companies as directed by B.C. Fox. In response to the trial court's questions regarding Tambornino's alleged complicity in Johnson's embezzlement, Richard agreed that he had only "suspicions," rather than concrete proof.

Richard's reliance on the " 'stringent requirements' " language of *Lauremann*, *supra*, 127 Cal.App.4th at page 1331, is misplaced. The language arises in the context of a petition to probate a lost or destroyed will that was subject to the presumption of revocation. (*Id*. at pp. 1331–1332.) In *Janes' Estate*, the California Supreme Court reversed an order denying a petition to probate a document alleged to be a holographic will. (*Janes' Estate*, *supra*, 18 Cal.2d at pp. 514, 517–518.) Our high court rejected the trial court's reasoning that the designation of the instrument as a " 'copy' " established a lack of testamentary intent and noted that the document "is on its face a complete and valid holographic will." (*Id*. at p. 516.) In accordance with this conclusion, the court explained that "[t]he statute relating to lost or destroyed wills has no application because the petition did not seek to probate a lost or destroyed will, but a complete, valid holographic will. . . . *The stringent requirements for proof of lost or destroyed wills are imposed to avoid fraud*. In the instant case the existence of fraud is precluded by the production of a valid will executed by the testator, together with evidence that it contained the disposition that he wished to make of his property, and that it was in his possession until the time of his death and could have been destroyed by him had he wished to revoke it." (*Id*. at pp. 517–518, italics added.)

The court in *Lauremann* applied this language from *Janes' Estate* when considering the burden of production required to negate the presumption of revocation that arises when a testator was the last person to possess the will, was competent until death, and neither the will nor a "duplicate original" can be found after the testator's death. (§ 6124; see *Lauremann*, *supra*, 127 Cal.App.4th at pp. 1331–1332.) The appeal in *Lauremann* centered on the third condition for application of the revocation presumption and whether a photocopy not personally executed by the testator and witnesses qualified as a " 'duplicate original.' " (*Lauremann*, at p. 1329.) The appellate court held that a photocopy did not qualify, considering in part the "intent and purpose of section 6124" (*id*. at p. 1331) and quoting *Janes' Estate* for the proposition that,

23

consistent with this purpose, " '[t]he stringent requirements for proof of lost or destroyed wills are imposed to avoid fraud.' " (*Ibid.*)

Richard did not introduce evidence at trial pursuant to section 6124 and has not argued its application on appeal. Nevertheless, as the trial court recognized in its statement of decision, "there is an overlay of a lost will" that Richard argued at trial that affected the burden of proof for the Foundation to establish due execution.[10] Richard contends that the language related to the " 'stringent requirements' " standard is not limited to rebutting the presumption of revocation and instead applies broadly in the context of cases involving the validity of lost or destroyed wills. He appears to suggest that the trial court was required to make express factual findings to the effect that the 2001 will met the " 'stringent' requirements" standard. He further asserts that if the Legislature had intended to limit application of the stringency requirement as referenced in *Janes' Estate* to the burden of production under section 6124, it would have clarified as much in the most recent 1990 statutory enactment of that statute. (Stats.1990, ch. 79, § 14.)

Richard's arguments presume too much from the quoted passage. Both the California Supreme Court's discussion in *Janes' Estate* and, more recently, the Court of Appeal's citation to the same passage in *Lauermann*, arose in reference to the presumption of revocation, which is inapplicable here. (*Janes' Estate*, *supra*, 18 Cal.2d at p. 518; *Lauremann*, *supra*, 127 Cal.App.4th at pp. 1331–1332.) Neither case purports to impose a more rigorous standard of proof than the statutory mandates for proving valid

---

**10** The trial court rejected Richard's argument that the Foundation had to prove the validity of the will by clear and convincing evidence. It held that section 8223 (regarding petition to probate a lost or destroyed will) and section 6110, subdivision (c)(2) (providing for clear and convincing evidence of the testator's intent when the statutory requirements of the testator's signature with two witnesses has not been met) do not apply where, as here, the copy of the original will conforms to the statutory requirements for due execution. Nevertheless, the court found that the evidence satisfied both standards of proof. Richard has not challenged this ruling on appeal.

24

execution of a will. Short of any elucidation in case authority about how such "stringent requirements for proof of lost or destroyed wills . . . to avoid fraud" (*Janes' Estate*, at p. 518) apply generally in probate proceedings involving lost or destroyed wills, we are unable to draw guidance on this issue from that passage. (See *B.B. v. County of Los Angeles* (2020) 10 Cal.5th 1, 11 [" ' "[C]ases are not authority for propositions not considered." ' "].)

We further disagree that the reenactment in 1990 of section 6124 supports Richard's interpretation of the case law. The principle of statutory construction relevant to this argument—in which courts presume the Legislature is "aware of existing statutes and judicial decisions when it adopts a statute" (*Gutierrez v. Carmax Auto Superstores California* (2018) 19 Cal.App.5th 1234, 1253)—does not assist Richard. Richard has not called on this court to construe section 6110 or any other statutory provision relevant to the execution of wills, and in any event, it is unclear what, if anything, the Legislature might have interpreted from the passage in *Janes' Estate*.

Moreover, even assuming, arguendo, that the party seeking to probate a lost or destroyed will is subject to more "stringent requirements" with respect to the burden of proof, that standard is arguably addressed by section 6110, subdivision (c)(2). Imposition of the "clear and convincing" standard when a will has not been executed in compliance with the standard statutory requirements of being signed by the testator and witnessed by at least two persons (*id*., subd. (c)(1)) effectively imposes a more rigorous and stringent standard of proof in cases that—absent other safeguards—may be more susceptible to fraud. (See *Estate of Ben-Ali*, *supra*, 216 Cal.App.4th at p. 1037 [describing the clear and convincing standard under § 6110, subd. (c)(2)].) Richard does not suggest that the " 'stringent requirements' " he refers to are related to this heightened standard of proof. Nor has he challenged the trial court's finding in its statement of decision that section 6110, subdivision (c)(2)'s clear and convincing standard does not apply here. Richard

25

merely asserts that more " 'stringent requirements' " should have been applied by the court.

We decline to adopt Richard's proposal for an independent " 'stringent requirements' " standard.  Richard's argument amounts to a disagreement with the trial court's assessment of the evidence—especially as to Tambornino's credibility and the authenticity of the copies of the 2001 will admitted into evidence—and would have this court draw different inferences.  This we cannot do.  "As in other cases involving the sufficiency of the evidence to sustain a verdict or finding, the power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the conclusion of the trier of the facts.  All conflicts must be resolved in favor of the respondent and all legitimate and reasonable inferences indulged in to uphold the verdict if possible.  When two or more inferences can be reasonably deduced from the facts, the reviewing court is without power to substitute its deductions for those of the trial judge or jury."  (*Weber's Estate*, *supra*, 113 Cal.App.2d at p. 165.)

Because we conclude that substantial evidence in the record supports the trial court's finding of due execution of the 2001 will, we affirm the trial court's ruling admitting the 2001 will to probate.

### III.  DISPOSITION

The judgment is affirmed.  Respondent is entitled to recover its reasonable costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1), (2).)

_____
Danner, J.

WE CONCUR:


_____
Bamattre-Manoukian, Acting P. J.



_____
Wilson, J.


**H051471**
*Gerald C. Fox Foundation v. Fox*